307 Ga. 129
FINAL COPY

S19A0908. MCKINNEY v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Sidney McKinney was convicted of malice murder for killing his former girlfriend Deborah Thigpen by beating and strangling her. On appeal, he argues that the trial court erred by admitting his conviction for a battery against Thigpen committed three months before the murder as well as evidence of his attack on another former girlfriend 15 years earlier. Appellant also argues that his trial counsel provided ineffective assistance by failing to object to the prosecutor's statements in closing argument that Appellant had previously raped Thigpen. We affirm.[1]

---

[1] Thigpen was killed on December 27, 2014. On August 5, 2015, a Thomas County grand jury indicted Appellant for malice murder, felony murder based on aggravated assault, and aggravated assault with an offensive weapon. Appellant was tried from January 25 to 27, 2016, and the jury found him guilty of all counts. The trial court sentenced Appellant to serve life in prison without the possibility of parole for malice murder. The court merged the felony murder and aggravated assault counts into the malice murder conviction, although the felony murder count was actually vacated as a matter of law, see *Malcolm v. State*, 263 Ga. 369, 374 (434 SE2d 479) (1993). Appellant filed a timely motion

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. Thigpen met Appellant in September 2013, and they began dating. In January 2014, Thigpen's friend Phillip Bradley saw her and Appellant walking down the street arguing. Appellant grabbed her a few times and pushed her. After the fight, Thigpen told Bradley that she wanted to get away from Appellant, and Bradley let her stay with him for a while. During that time, when Bradley and Thigpen would sit on his porch, Appellant would call her and say things like, "I can see what you're doing" and "I'm watching you." About three days after Thigpen started staying with Bradley, Appellant showed up at Bradley's house wanting to talk to Thigpen. She spoke with him briefly, but after Bradley told Appellant to leave and shut the door, Appellant became angry and kicked the door until it fell off its hinges. He left when Bradley threatened to call the

---

for new trial, which he later amended with new counsel. After a hearing, the trial court denied the motion on December 17, 2018. Appellant then filed a timely notice of appeal, and the case was docketed to the April 2019 term of this Court and submitted for decision on the briefs.

police. In February 2014, Thigpen reported to the police that Appellant had assaulted her, but he ultimately was not charged.

After Appellant and Thigpen's relationship ended in early 2014, Thigpen resumed a romantic relationship with Johnny Johnson. Thigpen told Johnson that Appellant had been "abusive and beat her all the time." On March 1, 2014, Thigpen was staying with Johnson. According to Thigpen's statements to Johnson and the police, after Johnson left for work that morning, Appellant broke into the house through a window and raped her. A responding police officer found the screen off the window and a flower pot placed as if somebody had used it to climb to the window. In an evolving story, Appellant eventually admitted to being in the house but claimed that he had consensual sex with Thigpen. Appellant was arrested for rape and burglary and held in jail from March until September 2014, when the grand jury declined to indict him.

On September 18, shortly after Appellant was released, he grabbed Thigpen on the street and tried to choke and sexually assault her. The responding police officer noted that Thigpen had

3

scratches on her back and arm, a cut over her lip, and swelling to her right eye. She also had some dirt on her back, and her clothing was disheveled. Appellant was charged with misdemeanor family violence battery; representing himself, he pled guilty in October 2014 and was sentenced to 12 months on probation.

Appellant knew that Thigpen, who was a habitual drug user and may have supported that habit with prostitution, frequently sat on a set of steps on Stevens Street in Thomasville. On more than one occasion, Johnson saw Appellant following Thigpen, and her aunt said that Appellant would "jump out of the bushes" at Thigpen. Another neighbor saw Appellant watching Thigpen "from the trees, bushes, anywhere he could stand to watch her." Thigpen was so scared of Appellant that she told at least six of her confidants, including relatives and close friends, that if anything ever happened to her, Appellant did it. And Johnson overheard a call Appellant made to Thigpen, in which Appellant said, "I'll kill you bi**h. If I can't have you, [Johnson] can't have you."

On the morning of December 27, 2014, Thigpen left Johnson to

walk with her friend John Cain across town. Johnson gave her a box cutter to protect herself from Appellant. Later in the day, Thigpen and Cain walked along the railroad tracks and used drugs. While on the tracks, Thigpen kept looking back and saying that someone was following them. Cain saw the "shadow of a man" behind them. Thigpen said she was scared, and they left quickly. They went to a house about a block away from the steps where Thigpen frequently sat. At around 7:30 p.m., they started walking away from the house in search of a drug dealer. A man Thigpen knew drove up, and she got in the car. Cain walked to a nearby store; as he was leaving at about 8:00 p.m., he saw Appellant walking on Stevens Street. At 8:34 p.m., a Thomasville police officer who knew Thigpen saw her sitting on her usual steps.

Around noon the next day, two men found Thigpen's body in the bushes along a path behind an abandoned house across from the steps on Stevens Street. She was naked from the waist down. In a nearby trash can, a detective found a pair of panties and two pairs of tights rolled on top of each other with leaves and other debris on

them. Johnson and Cain identified the tights as the ones Thigpen was wearing when they last saw her. The injuries on Thigpen's body indicated that she had been hit multiple times on the head and in the face and that a hand and a ligature of some kind, such as tights pulled taut, had been wrapped and squeezed around her neck. She also had scrapes along her buttocks area, indicating that she had been dragged or was trying to scoot away while on the ground. The cause of Thigpen's death was asphyxia and blunt force trauma. It would have taken at least five minutes for her to be killed in this way. A sexual assault kit revealed no injuries in her genital area, and swabs of the area did not show any male DNA. Under Thigpen's fingernails, however, there was DNA from Appellant.

Around 7:30 p.m. on the day Thigpen's body was found, a GBI special agent picked up Appellant from his mother's house and interviewed him at the police station. Appellant had small cuts and a bite on his hands and a scratch on the left side of his neck. He also had recently chewed off all of his fingernails. Appellant first told this story: He had not seen Thigpen since December 17, when they had

6

sex along the path behind the abandoned house on Stevens Street. He had been walking from his parents' house to buy a cigarette on the evening of December 27 when he encountered a drunk man in the street in front of a housing project. Appellant tried to pull the man out of the road, but the man fought back with a box cutter and bit Appellant's hand. Eventually, Appellant wrested the box cutter away and left. (Investigators later spoke to people who lived in the housing project, but could not find anyone who corroborated Appellant's story.)

When the agent told Appellant that someone saw him on Stevens Street on December 27, he changed his story, first saying that he was on a parallel street and then admitting that he had been on Stevens Street. When the agent told Appellant that they would be examining Thigpen's body for DNA that can be transferred by touch, Appellant again changed his story, claiming that he had seen Thigpen between 12:00 and 2:00 p.m. on December 27; she was on the path behind the abandoned house and asked Appellant to make sure nobody came by so she could urinate; he did so and then rubbed

7

his hand on her clothed chest before he left. When he was asked if there was any reason his DNA would be on Appellant's thighs, he again amended his account, claiming that in addition to touching Thigpen's chest, he stuck his hand down her pants and rubbed between her thighs. Appellant claimed that he had been wearing a black or dark brown sweatshirt and that he had not washed his clothes.

Phone records, surveillance videos, and witness accounts showed that on December 27, Appellant called his friend Craig Staten to ask for a ride first at 8:32 p.m. from a liquor store close to where Thigpen's body was found and again at 9:14 p.m. from a house about 100 yards away from the body's location. When Staten picked Appellant up at around 9:22 p.m., he noticed that Appellant had deep scratches and a bite mark on his hands. Appellant claimed that he had fought a man with a bat. Appellant stayed overnight with Staten. Appellant showered but put the same clothes back on. The next day, Staten took Appellant to Appellant's mother's house. When investigators searched his mother's house, she told them that

Appellant had been doing laundry right before he left for his interview. In the dryer, there was a single outfit, which included a grey sweatshirt. A fiber found on Thigpen's body matched the fibers found in that type of sweatshirt. In December 2014, while Appellant was being held in jail, a guard heard him say, "I don't have any remorse about what I did."

Appellant did not testify at trial. His main defense was that the law enforcement officers failed to fully investigate other potential suspects because they rushed to judgment against him based on his history with the victim.

Appellant does not dispute the legal sufficiency of the evidence supporting his conviction. Nevertheless, as is this Court's usual practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of malice murder. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v.*

*State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. At trial, Appellant objected to the admission into evidence of a certified copy of his misdemeanor battery conviction resulting from his September 2014 attack against Thigpen, on the ground that he was not represented by counsel when he pled guilty.[2] Appellant was not able to provide any law supporting this objection, and the trial court overruled it. Appellant now argues that the conviction was inadmissible hearsay and that its admission also violated his right to confront the witnesses against him guaranteed by the Sixth Amendment to the United States Constitution. Appellant did not make a hearsay or Confrontation Clause objection at trial, however, so these claims are reviewed only for plain error. See OCGA § 24-1-103 (d); *Varner v. State*, 306 Ga. 726, 730 (832 SE2d 792) (2019).[3]

---

[2] The conviction exhibit included the accusation, the guilty plea form, and the sentencing form.

[3] Because this case was tried in 2016, it was governed by Georgia's new Evidence Code, which took effect on January 1, 2013. See Ga. L. 2011, pp. 99,

To establish plain error, Appellant

> must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

*Lupoe v. State*, 300 Ga. 233, 243 (794 SE2d 67) (2016) (citation and punctuation omitted). Appellant has not established plain error because he has not shown a clear error or that the alleged error affected his substantial rights.

(a) "'An error cannot be plain where there is no controlling authority on point.'" *Jackson v. State*, 306 Ga. 69, 82 (829 SE2d 142) (2019) (citation omitted). Appellant has identified no controlling

---

100 § 1. Although this Court has admonished attorneys to identify the applicable Evidence Code and cite its pertinent provisions and case law interpreting them, see, e.g., *Davis v. State*, 299 Ga. 180, 192 (787 SE2d 221) (2016), the attorneys for Appellant, the District Attorney's office, and the Attorney General's office all filed briefs with useless and sometimes misleading citations to cases decided under the old Evidence Code. We therefore ordered the parties to file corrected briefs within ten days with citations to, and analysis of, the applicable Evidence Code provisions and case law. The parties did so, with some helpful results. The Attorney General, for example, now recognizes that under the new Evidence Code, Appellant's failure to raise his Confrontation Clause argument did not waive appellate review entirely, although it restricts review to plain error under OCGA § 24-1-103 (d).

11

authority — nor have we found any — supporting his argument that a conviction resulting from an uncounseled misdemeanor guilty plea not resulting in imprisonment is inadmissible hearsay or inadmissible under the Confrontation Clause. The two cases Appellant cites for his position do not support his hearsay or Confrontation Clause arguments — or even his more generalized argument that his uncounseled guilty plea to a misdemeanor not resulting in imprisonment should not be used against him. See *Nichols v. United States*, 511 U.S. 738, 746-747 (114 SCt 1921, 128 LE2d 745) (1994) (holding that an uncounseled guilty plea to a misdemeanor can be used in sentencing for a subsequent offense, even if that use increases the subsequent punishment to imprisonment); *Nash v. State*, 271 Ga. 281, 285 (519 SE2d 893) (1999) (holding that to use a prior guilty plea for recidivist sentencing, the State must prove, among other things, that the defendant had counsel "in all felony cases and those misdemeanor proceedings where imprisonment resulted").

Moreover, although this Court recently held that the

Confrontation Clause is violated when convictions of *other* people are admitted against a defendant, we explained that "nothing about this scenario can be read to suggest that a particular defendant's prior conviction could not be used against that *same* defendant in his or her own case under the proper circumstances." *State v. Jefferson*, 302 Ga. 435, 441-443 & n.6 (807 SE2d 387) (2017) (emphasis in original). Because there is no controlling authority supporting Appellant's argument, he has failed to show a clear error. See *Jackson*, 306 Ga. at 82.

(b) To show that an error affected his substantial rights, Appellant must "make an affirmative showing that the error probably did affect the outcome below." *Lupoe*, 300 Ga. at 243 (citation and punctuation omitted). The battery conviction was cumulative of Johnson's testimony recounting Thigpen's description of the September 2014 attack and the responding officer's testimony about Thigpen's injuries.[4] The only information the conviction added

---

[4] The responding officer's report was also admitted into evidence, but it was not read to the jury or given to the jury during deliberations.

was that Appellant took responsibility and was punished for this battery of Thigpen. In addition, the jury heard substantial testimony about other prior difficulties between Appellant and Thigpen, to which Appellant did not raise any objection. In light of the testimony about the September 2014 battery as well as the other strong evidence that Appellant killed Thigpen, including DNA and fiber evidence and Appellant's own shifting and unconvincing accounts, the admission of his battery conviction did not probably affect the trial's outcome. See id. at 243-244. See also *Williams v. State*, 301 Ga. 829, 832 (804 SE2d 398) (2017) (holding in the context of ordinary appellate review that the admission into evidence of the appellant's first offender plea record, even if error, was not harmful because the jury heard extensive testimony about prior difficulties between the appellant and the victim, the jury knew he had been arrested for the incident resulting in the plea, and the evidence that he killed the victim was overwhelming).

3. (a) At trial, the State presented evidence of Appellant's prior assault of a former girlfriend. The former girlfriend testified that

she dated Appellant and lived with him for about a year in 1999. Four days after she kicked him out of the house, he came to her and said that he wanted to talk. They walked down the street calmly talking for a while; then Appellant suddenly grabbed her by the neck and dragged her down into nearby bushes. He held one arm around her neck in a choking manner and dragged her backward, making her lie down. While Appellant choked her with one hand, he tried to take off her clothes with the other. He stopped his attack when she said that they had not really broken up. Appellant later pled guilty to aggravated assault with the intent to rape, and a certified copy of that conviction was admitted into evidence.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a defendant, but such evidence may be admissible for other purposes, including identity, intent, and motive — the specific purposes for which the trial court admitted evidence of Appellant's attack against his former girlfriend. See OCGA § 24-4-404 (b) ("Rule 404 (b)"). Under Rule 404 (b), evidence of an extrinsic act is admissible if:

15

(1) the evidence is relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Jackson*, 306 Ga. at 76 (citation and punctuation omitted).

(b) Of the three purposes for which evidence of the prior attack was admitted, the prosecutor focused most in his closing argument on the purpose of proving Appellant's identity as the perpetrator in the charged attack against Thigpen. The trial court did not abuse its discretion by admitting the evidence for that purpose.

As to the first element of the Rule 404 (b) test, "'[w]hen extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused.'" *Brooks v. State*, 298 Ga. 722, 725 (783 SE2d 895) (2016) (citing *United States v. Phaknikone*, 605 F3d 1099, 1108 (11th Cir. 2010)). See also id. ("'A much greater degree of similarity between the charged crime and the uncharged crime is required

16

when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind.'" (quoting *United States v. Cardenas*, 895 F2d 1338, 1342 (11th Cir. 1990)).[5]

Here, the prior conduct and the charged offenses share several significant similarities. In both incidents, the assailant dragged a female victim off a walkway into nearby bushes, pulling her backward and to the ground; choked her with his hand; and removed or tried to remove her clothes. Appellant argues that these similarities are characteristic of many attacks on women, rather than being indicative of his handiwork. See, e.g., *United States v. Lail*, 846 F2d 1299, 1301 (11th Cir. 1988) (explaining that certain shared traits, such as the use of a handgun and lack of disguise, did not help prove identity because they were traits common to many bank robberies).

But even if he were right, his argument overlooks a crucial

---

[5] "OCGA § 24-4-404 (b) is modeled on Federal Rule of Evidence 404 (b). We therefore look to the decisions of the federal appellate courts, particularly the decisions of the Eleventh Circuit, for guidance in construing and applying the [Georgia] rule." *Strother v. State*, 305 Ga. 838, 846 (828 SE2d 327) (2019) (footnote omitted).

similarity — both victims were Appellant's former girlfriends. And although the charged crimes and the prior attack occurred 15 years apart, each attack was committed after the victim's relationship with Appellant ended. See *United States v. Grimmette*, 208 Fed. Appx. 709, 711 (11th Cir. 2006) (explaining that to be admissible to prove identity, prior crimes need not be identical "'in every detail[, b]ut they must possess a common feature or features that make it very likely that the unknown perpetrator of the charged crime and the known perpetrator of the uncharged crime are the same person'" (citation omitted)). It is true that unlike in the prior attack, the assailant in the crimes charged in this case also hit the victim in the head and used not only his hand to choke her but also a ligature (likely the tights removed from the victim). However, under all of the circumstances, including the evidence that the prior victim talked Appellant into stopping the attack against her, those differences do not constitute major dissimilarities. See *United States v. Whatley*, 719 F3d 1206, 1218 (11th Cir. 2013) (considering dissimilarities in evaluating whether prior act evidence was

admissible to prove identity). See also *Brooks*, 298 Ga. at 725-726.

Comparison of the two incidents indicates that "the possibility is quite remote" that a person other than Appellant committed the charged crimes of attacking one of Appellant's ex-girlfriends in a very similar way as his 1999 attack on another ex-girlfriend. *United States v. Miller*, 959 F2d 1535, 1539 (11th Cir. 1992) (holding that two drug deals had a sufficiently strong similarity to prove identity, including that the supplier in both was called "Louis" and the meeting place was the same residence). See also *United States v. Stubbins*, 877 F2d 42, 44 (11th Cir. 1989) (holding that the "sufficiently unusual and distinctive" feature that both drug offenses happened at the same address made the prior offense relevant to prove identity). Thus, the trial court could properly conclude that evidence of the prior attack was relevant to prove identity.

The second part of the Rule 404 (b) test invokes OCGA § 24-4-403, which is designed to "'exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *Kirby v. State*, 304 Ga. 472, 480 (819 SE2d 468) (2018)

19

(citation omitted).[6] The prior attack evidence had significant probative value, given the similarities between the two incidents and the State's need to prove the identity of Thigpen's killer to overcome Appellant's defense theory and the stories he gave the police, which all asserted that he was not involved in Thigpen's murder. See *Brannon v. State*, 298 Ga. 601, 607-608 (783 SE2d 642) (2016); *Miller*, 959 F2d at 1540.

The evidence that Appellant had assaulted another woman was obviously prejudicial to him, but the trial court could reasonably conclude that this prejudice did not substantially outweigh the significant probative value of the prior attack. See *Brannon*, 298 Ga. at 608; *Miller*, 959 F2d at 1540. See also *Anglin v. State*, 302 Ga. 333, 337 (806 SE2d 573) (2017) (explaining that although "evidence of gang membership can be highly prejudicial," "in a criminal trial,

---

[6] OCGA § 24-4-403 says:

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

inculpatory evidence is inherently prejudicial; 'it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion.'" (citations omitted; emphasis in original)). Additionally, the trial court instructed the jury both when the prior act evidence was admitted and in the final jury charge that the jury should not consider the prior act evidence to prove Appellant's character, but should consider it only to the extent that it was relevant to show his identity, intent, and motive in the charged crimes. See *McWilliams v. State*, 304 Ga. 502, 511 (820 SE2d 33) (2018) ("Any prejudicial impact of the extrinsic acts evidence was mitigated when the trial court gave the jury specific instructions about the limited purpose of the evidence.").

Finally, the former girlfriend's testimony identifying Appellant as her attacker and his subsequent conviction for aggravated assault undeniably met the third element of the Rule 404 (b) test by providing sufficient proof for the jury to find by a preponderance of the evidence that Appellant committed the prior attack. For these reasons, the trial court did not abuse its discretion in admitting this

21

evidence to prove identity.[7]

4. During closing argument, the prosecutor described Appellant's behavior toward Thigpen as "spik[ing] upwards to a rape." The prosecutor then acknowledged that the grand jury had "no billed" the rape charge arising from the March 2014 incident and that the State had to accept what the grand jury decided, but he continued, "this rape happened." He later described Appellant as a person who had attacked and raped Thigpen before the murder. Appellant's trial counsel did not object to any of these statements.

---

[7] On appeal, the State primarily argues that evidence of the 1999 attack was admissible to prove Appellant's intent in this case. Evidence of the prior assault may have been *relevant* for this purpose, but it was of very limited *probative value* because the prosecutorial need for it was negligible (and it was temporally remote). See *Jackson*, 306 Ga. at 77 ("Factors to be considered in determining the probative value of other-act evidence offered to prove intent include its overall similarity to the charged crime, its temporal remoteness, and the prosecutorial need for it."). There was no real dispute that whoever beat and strangled Thigpen to death had the intent required for malice murder and aggravated assault with an offensive weapon. See id. at 78 (explaining that there was no real prosecutorial need to prove intent when all of the evidence indicated that the person who repeatedly fired a gun at the victim had the requisite general intent to commit an assault with a deadly weapon); *Kirby*, 304 Ga. at 486 (holding that there was "little if any prosecutorial need for extrinsic evidence" to prove that the person who repeatedly stabbed the victim had the requisite intent). See also *Jackson*, 306 Ga. at 80 n.12. Under the circumstances of this case, however, we need not decide whether the evidence that was properly admitted to prove identity was also admissible to prove intent or motive. See *Kirby*, 304 Ga. at 487.

At the motion for new trial hearing, trial counsel testified that he did not recall the prosecutor's focusing too much on the alleged rape and that he did not object to the rape references because they fit in with his theory of the case as a rush to judgment, showing that "[e]verything this woman claimed about [Appellant] [the State] would believe, . . . even to the point that they tried to have a case indicted [when] they couldn't even get it past the [g]rand [j]ury." In fact, in his own closing argument, trial counsel noted that Appellant had been accused of raping Thigpen and kept in jail for six months until the grand jury "no billed" the charge; counsel reminded the jury that a police investigator had testified that it was unusual for a grand jury not to indict.

Appellant contends that his trial counsel provided ineffective assistance by failing to object to the prosecutor's comments characterizing him as a rapist. "To prevail on this claim, [Appellant] must show that his counsel's performance was professionally deficient and that, but for the deficiency, there is a reasonable probability that the outcome of the trial would have been more

favorable to him." *Cushenberry v. State*, 300 Ga. 190, 197 (794 SE2d 165) (2016). See also *Strickland v. Washington*, 466 U. S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). "Whether to object to a particular part of a prosecutor's closing argument is a tactical decision, and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance." *Smith v. State*, 296 Ga. 731, 735-736 (770 SE2d 610) (2015) (citations and punctuation omitted).

Here, trial counsel's decision not to object to the prosecutor's comments was not unreasonable. The comments referred to evidence of the rape that had been admitted, so an objection likely would have failed. See *Blaine v. State*, 305 Ga. 513, 519 (826 SE2d 82) (2019) (explaining that "a prosecutor is granted wide latitude in the conduct of closing argument" and "is entitled to emphasize the evidence favorable to the State" (citation and punctuation omitted)). And by acknowledging the grand jury's refusal to indict Appellant for the rape, the comments served as a reminder for the jury that the State had brought an earlier, unsuccessful case against

Appellant for an alleged attack on Thigpen. Counsel reasonably concluded that this reminder helped support the defense theory that law enforcement rushed to judgment against Appellant. Accordingly, Appellant has failed to prove that his counsel was deficient, and his claim of ineffective assistance of counsel fails. See *Cushenberry*, 300 Ga. at 197 ("'Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.'" (citation omitted)). [8]

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 21, 2019.
Murder. Thomas Superior Court. Before Judge Hardy.
*Conger & Smith, Gregory D. Smith*, for appellant.
*Bradfield M. Shealy, District Attorney, James L. Prine II, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K.*

---

[8] Appellant also contends in the heading of this enumeration that the trial court erred by allowing the prosecutor's statements, but he does not make any argument on this point, and his failure to object at trial waived such a claim. See *Gates v. State*, 298 Ga. 324, 329 (781 SE2d 772) (2016).

*Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.