309 Ga. 319
FINAL COPY

S20A0404.  BARBOZA v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Isadore Barboza was convicted of malice murder and other crimes after he, Renee Harris, and Quondre Bentley committed an armed robbery of Ebone Driskell and Exzavious Brooks in a restaurant parking lot that resulted in the deaths of Bentley and Driskell. In this appeal, Appellant argues that the trial court erred by commenting on Harris's testimony, that the exhibit used to prove Appellant's prior armed robbery conviction should not have been admitted into evidence, and that Appellant should not have been sentenced as a recidivist. He also argues that his counsel provided ineffective assistance by failing to raise these claims at trial. We affirm.[1]

---

[1] The crimes occurred on October 28, 2013. On January 23, 2014, a Cobb County grand jury indicted Appellant and Harris for the malice murder of Driskell, two counts of felony murder of Driskell (based on aggravated assault and armed robbery), two counts of felony murder of Bentley (based on the same

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. According to Harris, on the night of October 27, 2013, she drove her boyfriend Bentley and his friend Appellant to Doc's restaurant in Cobb County. Bentley and Appellant planned to rob a "weed man." Bentley had brass knuckles and a gun, and he gave the gun to

underlying felonies), aggravated assault of Driskell, two counts of aggravated assault of Brooks (with a deadly weapon and with the intent to rob), armed robbery of Driskell, and two counts of possession of a firearm during the commission of a felony. Appellant alone was also charged with a felony murder count for each victim based on possession of a firearm by a convicted felon. The trial of Appellant and Harris began on October 5, 2015. Before jury selection, Harris pled guilty to one count of armed robbery, and the State agreed to dismiss the other charges against her; she then testified for the State. On October 9, the jury found Appellant guilty of all charges, and the trial court sentenced him as a recidivist to serve life in prison without the possibility of parole for malice murder and for armed robbery, 20 concurrent years for each of the aggravated assault counts against Brooks, and five consecutive years for each count of possession of a firearm during the commission of a felony. The court vacated all of the felony murder counts and merged the count for aggravated assault against Driskell into the malice murder count. At the motion for new trial hearing, the State noted that the court should have sentenced Appellant on one of the counts of felony murder of Bentley, but the State has not challenged Appellant's sentences on appeal. See *Dixon v. State*, 302 Ga. 691, 698 (808 SE2d 696) (2017). Appellant filed a timely motion for new trial, which he amended with new counsel on January 11 and January 25, 2019. After a hearing, the trial court denied the motion on July 30, 2019. Appellant then filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2019 and submitted for decision on the briefs.

Appellant. When they arrived at Doc's, they all went inside.[2] Harris sat away from Bentley and Appellant, eating dinner with someone else. When she was finished around 1:00 a.m., she found the men again. Their plan to rob the "weed man" had not come to fruition, and they were ready to leave. Harris, Bentley, and Appellant got in her car, but a man Harris knew only as "K" then approached the car and tapped on the window. He told Bentley and Appellant that there was a man inside the restaurant with a lot of cash. Bentley and Appellant decided to rob the man. They walked toward the front of Doc's, but did not go inside.

Harris remained in the car, but after a short time Bentley, who apparently wanted more information on their robbery target, sent Harris a text message that said, "Go look and see what he doing. He's to the right and let me know ASAP." Harris sent a text back to Bentley saying, "I don't see anybody to the right." Bentley then sent

---

[2] Harris's testimony that she, Bentley, and Appellant went into Doc's was confirmed by surveillance video from the front door of the restaurant showing them enter. In addition, Appellant's cell phone records showed that his phone pinged on a tower near Doc's from 9:09 p.m. on October 27 until 1:26 a.m. on October 28.

Harris two more messages, which said, "Go inside," and "He got black and white Reeboks." Meanwhile inside Doc's, Brooks and his friend Driskell were getting ready to leave. Earlier that night, Brooks, who was wearing expensive Reebok shoes, had pulled out about $8,000 in $100 bills and was "flashing it around" to prove that he did not need to pay for his food in advance. Surveillance video from inside Doc's showed that Harris entered the restaurant just as Driskell and Brooks left.

As Driskell and Brooks arrived at their car in the parking lot, they were approached by Bentley and Appellant. Bentley went to the driver side of the car, and at some point, he and Driskell, who was carrying a 9mm handgun, began fighting inside the car. Meanwhile, on the passenger side of the car, Appellant pointed a gun at Brooks and said, "Don't move. Where the money at?" Brooks fought back; he was able to break away from Appellant and run inside Doc's to seek help. At some point during his struggle and run,

Brooks heard gunshots.[3]

During the brief time that Brooks was inside Doc's, Appellant joined Bentley inside Driskell's car; the men then pushed Driskell out and drove away. When Brooks came out of Doc's, he saw Driskell on the ground with her gun nearby. He picked her up and helped her walk a couple steps before she collapsed. The police were called and arrived around 1:15 a.m. Driskell was taken to the hospital, but she could not be revived. She died from a single gunshot wound; the bullet had entered her back and exited through her lower abdomen.

Harris, who had remained inside Doc's for some time after she could not find the robbery target, left after she heard a gunshot and someone came in and said that a robbery was happening. When she could not find Appellant or Bentley in the parking lot, she called Appellant many times with no answer. Phone records show that

---

[3] Brooks did not know Appellant or Bentley. He described the man who attacked Driskell as wearing a striped shirt and the man who held him at gunpoint as having dreadlocks and wearing a hoodie. At trial, Harris identified Bentley and Appellant on the surveillance video. Bentley was wearing a striped pullover sweatshirt, and Appellant had dreadlocks and was wearing a jacket with a hood. At trial, Brooks identified Appellant as the man in the hoodie, although when he was shown a photographic lineup 12 hours after the shooting, he identified the photograph of a different man as his assailant.

Harris called Appellant 13 times between 1:15 and 1:20 a.m. Appellant called Harris back at 1:20 a.m., but the call lasted only nine seconds. Harris then called Appellant again at 1:20 and 1:21 a.m. The detective who analyzed the cell phone records testified that all of the calls before the call at 1:21 a.m. went to voicemail. The call at 1:21, however, lasted over three minutes, indicating that Appellant and Harris had a conversation. Harris testified that when she was finally able to speak to Appellant, he told her to drive to a different parking lot to meet him.

When Harris arrived there, Appellant, who was still carrying the gun he had at Doc's, came out of the nearby woods alone. Harris asked where Bentley was, and Appellant seemed reluctant to give her a straight answer. He first said that Bentley "told me to leave him" and then that Bentley had been "shot in the leg or something of that nature" and implied that Bentley was "towards an ambulance." Appellant eventually convinced Harris to drive him to meet his sister, who picked him up and drove him to the house in Marietta where he was living. During the drive, Appellant told his

sister that he had tried to rob somebody, there had been a shooting, and he killed somebody.[4]

After leaving Appellant with his sister, Harris drove to hospitals trying unsuccessfully to find Bentley. Police officers found Driskell's car about half a mile away from Doc's. Bentley was dead in the passenger's seat. He had been shot in the clavicle; he had an exit wound and a small bullet fragment in his back. He also had abrasions on his knuckles. The police found brass knuckles underneath his body and Driskell's purse on the ground near the car.

The State's firearms examiner could not determine what kind of gun fired the bullet fragment taken from Bentley's back. Driskell's 9mm gun was found lying in Doc's parking lot near her body. It had a spent shell casing inside, meaning that the gun had been fired but malfunctioned and did not eject the shell casing as usual. A spent

---

[4] This testimony came from a co-worker of Appellant's sister recounting what the sister had told her. Appellant's sister testified that Appellant told her that "a boy was shot in the leg" and Appellant "left him in the car and that the police were coming."

.380 bullet and a .380 shell casing, both of which had been fired from a Hi-Point gun, were also found in Doc's parking lot.

The night after the shooting, Appellant moved from Marietta to his family's apartment in Augusta. He was located and arrested there three days later, on November 1. He no longer had dreadlocks, but shaved dreadlocks were found in the trashcan inside his apartment. Appellant did not testify at trial. His main defense was that the State had not proven its case because it had no scientific evidence linking him to the crimes and the State's witnesses were not credible.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's customary practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the malice murder of Driskell and the other crimes against Driskell and Brooks of which

he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Harris was indicted with Appellant, but on the first day of their joint trial, before the jury was selected, she pled guilty to armed robbery. The State agreed to dismiss the other charges against her, and Harris agreed to testify truthfully against Appellant. During the plea hearing, the prosecutor asked the court to withhold sentencing until after Harris testified, but the court and the lawyers discussed possible sentences. Harris's counsel said that he would ask the court to sentence her to serve five years in prison. The prosecutor said that if Harris fulfilled her obligation and testified as expected, the State would ask for her to be sentenced to serve ten years in prison and another ten years on probation. The court made clear to Harris that the maximum sentence she could receive would be life in prison.

When the trial court turned its attention back to Appellant's trial, the court expressed concern about Harris's name being in the indictment, which could affect voir dire. The court said that it wanted to clarify why she was charged in the indictment but was not on trial. The court then told the first group of prospective jurors:

> [T]he indictment that you will have with you will show the State of Georgia versus Isadore Walker Barboza and Renee Elizabeth Harris. And earlier this morning, Ms. Renee Elizabeth Harris, the co-defendant to this defendant, pled guilty to Count 9 of the indictment. And Count 9 was . . . armed robbery . . . .
> An[d] in return for this plea of guilty to only one count, that is the armed robbery count, the State and the defense have entered into somewhat of an agreement. First of all, that I will not impose sentencing until this trial is over with, number one. Number two, the State is going to ask that she receive a sentence of twenty years, and of that twenty years, to serve ten years incarcerated. And the defense is going to ask that I give her a sentence of five years to serve.
> And part of the plea negotiations was that the defendant, Ms. Harris, would give truthful testimony concerning her co-defendant . . . during his actual jury trial. And so if she did not give truthful testimony, in the opinion of the State, then the State could ask for a life imprisonment. Is that right, [prosecutor]?

The prosecutor answered, "That's accurate."

On the second day of the trial, the court brought in a new group

of prospective jurors and told them:

> [I]f you are on the jury, you will have the indictment with you during your deliberations. And this is called a general bill of indictment. It's the State of Georgia versus Isadore Walker Barboza and Renee Elizabeth Harris.
>
> I do want to tell you this, that yesterday morning, Renee Elizabeth Harris, who was a co-defendant, pled guilty to Count 9 of the indictment. Count 9 being the count accusing her of armed robbery. She pled guilty to that, and her sentence has not been imposed yet. Her sentence will not be imposed until after the completion of this trial.
>
> And so both the State and the defense have entered into an agreement . . . whereby the defendant, Ms. Harris, will receive a sentence of either — the State is going to recommend twenty years to serve ten years, and the defense is going to ask for a sentence of five years to serve. And so that sentence, the recommendation of the State for twenty to serve ten, with the other ten years on probation, is premised and conditioned on her giving truthful, absolutely truthful testimony during the trial of Mr. Barboza, the trial that we're about to undertake.
>
> And so if she were to not, in the opinion of the State, give truthful testimony, then they would revoke their agreement and they would ask me to sentence her to life in prison. So you need to be aware of all that.

Appellant did not object to these comments.

When Harris testified, she acknowledged on direct examination that she had pled guilty to armed robbery, that she had negotiated a deal with the State to testify, that her attorney would

request that she be sentenced to serve five years in prison, that the maximum sentence she could receive was "twenty or life," and that her sentence would be up to the judge. On cross-examination, Harris testified that before she made a deal with the State, she had been facing seven counts of murder, which were now dismissed.[5] She acknowledged that if the prosecutor was not "satisfied" with her testimony, he would ask that she be sentenced to serve life in prison. Appellant's trial counsel asked if Harris thought she was "pleasing the district attorney" with her answers, and she said yes. During his opening statement and closing argument, trial counsel pointed out that Harris was motivated to testify for the State to avoid multiple murder charges.

(a) Appellant argues that the trial court's explanations of Harris's plea deal to the prospective jurors was automatically reversible error under OCGA § 17-8-57 (c) or, alternatively, plain error under OCGA § 17-8-57 (a) and (b). OCGA § 17-8-57 says, in

---

[5] Because Harris was not indicted for the felony murder counts based on possession of a firearm by a convicted felon, she was actually facing five murder charges.

relevant part:

> (a) (1) It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused.
>
> . . .
>
> (b) Except as provided in subsection (c) of this Code section, failure to make a timely objection to an alleged violation of paragraph (1) of subsection (a) of this Code section shall preclude appellate review, unless such violation constitutes plain error which affects substantive rights of the parties. Plain error may be considered on appeal even when a timely objection informing the court of the specific objection was not made, so long as such error affects substantive rights of the parties.
>
> (c) Should any judge express an opinion as to the guilt of the accused, the Supreme Court or Court of Appeals or the trial court in a motion for a new trial shall grant a new trial.

To establish plain error under OCGA § 17-8-57 (b), "Appellant must point to a legal error that was not affirmatively waived, was clear and obvious beyond reasonable dispute, affected his substantial rights, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Bamberg v. State*, 308 Ga. 340, 352 (839 SE2d 640) (2020).

Although it was unusual, and unnecessary, for the trial court

to explain Harris's plea deal to the potential jurors,[6] the explanations were in no way a comment on Appellant's guilt in violation of OCGA § 17-8-57 (c). Nor were they comments on whether a fact at issue had or had not been proved in violation of OCGA § 17-8-57 (a). The court summarized the undisputed terms of Harris's plea deal; the court did not tell the jury that her testimony would be truthful, but rather stated accurately that the State's sentencing recommendation would depend on whether Harris's testimony was truthful "in the opinion of the State." Thus, the court's comments were not error under OCGA § 17-8-57 (a), let alone clear and obvious error. See *Brown v. State*, 302 Ga. 454, 463 (807 SE2d 369) (2017) (holding that the trial court's explanation to the jury about why the defendant's video-recorded interview with the police had been redacted did not violate OCGA § 17-8-57); *Smart v. State*, 299 Ga. 414, 423 (788 SE2d 442) (2016) (holding that the trial court's telling

---

[6] The court had discretion to redact the indictment to remove Harris's name, see *Moss v. State*, 298 Ga. 613, 615 (783 SE2d 652) (2016), or the court simply could have told the prospective jurors that Harris was not a defendant in this trial and allowed the parties to elicit information about her plea deal and her role in the case when Harris testified.

potential jurors that the defendant was charged with the murder of his wife "was merely explaining the nature of the case during voir dire" and did not violate OCGA § 17-8-57).

(b) Appellant also argues that his trial counsel provided ineffective assistance by failing to object to the trial court's comments. To prevail on this claim, Appellant must establish that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "To show deficient performance, Appellant must prove that his lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Thornton v. State*, 307 Ga. 121, 126 (834 SE2d 814) (2019). In particular, decisions regarding trial tactics and strategy constitute deficient performance only if they were so patently unreasonable that no competent attorney would have followed such a course. See id. "To establish prejudice, Appellant must prove that there is a reasonable probability that, but for counsel's deficiency, the result

of the trial would have been different." Id. We need not address both parts of the inquiry if Appellant makes an insufficient showing on one. See id.

At the hearing on Appellant's motion for new trial, trial counsel testified that he did not object to the court's explanations of Harris's plea deal to the prospective jurors because he thought that the court's saying that Harris had to be truthful "in the opinion of the State" would be helpful to Appellant's case. Counsel did not believe that the court's statements communicated to the jury that Harris's testimony would be truthful.

Trial counsel's decision not to object to the trial court's accurately explaining Harris's plea deal to the jurors was not deficient performance; it was instead a reasonable strategy. As counsel testified, the court's explanations highlighted that Harris was motivated to testify in a way that the State believed was truthful in order to get a favorable sentencing recommendation. Counsel took advantage of the foundation laid by the court's comments during his cross-examination of Harris by discussing her

plea deal in depth, including getting her to acknowledge that she needed to "satisf[y]" the prosecutor with her testimony to avoid a life sentence recommendation from the State and that she thought she was "pleasing the district attorney" with her testimony. Appellant's ineffective assistance of counsel claim therefore fails. See, e.g., *McKinney v. State*, 307 Ga. 129, 140 (834 SE2d 741) (2019) (holding that counsel did not perform deficiently by deciding not to object to comments by the prosecutor that may have helped support the defense).

3. As noted in footnote 1 above, Appellant was charged with two counts of felony murder based on possession of a firearm by a convicted felon. To prove that Appellant was a convicted felon, the State introduced as its Exhibit 158 evidence of Appellant's conviction for armed robbery in 1991 in Massachusetts. Appellant's counsel did not object to the admission of the exhibit, but he did request a limiting instruction. The trial court accordingly instructed the jury that it could consider evidence of Appellant's prior conviction only as the evidence related to the two counts of felony

murder based on possession of a firearm by a convicted felon, and not for any other purpose.

Exhibit 158 is 19 pages long. The first two pages are the Massachusetts indictment of Appellant for the armed robbery; the face page of the indictment has typed notations indicating that Appellant pled guilty to the charge on July 2, 1991, and was sentenced to serve between six and sixteen years in prison, concurrent with a sentence imposed the same day in another case. The next 15 pages are court docket sheets for the armed robbery as well as 11 other numbered cases, which appear to involve these crimes: "RMED ASSLT DWELL HOUSE," "&B D/W," "&B D/W," "RMED ASSLT INT MURDER,"[7] "LARCENY IN TRUCK," "A&B D/W," "LARCENY M/V," "UNL CARRY D/W," "ASSLT D/W," "REC STOLEN PROP (MORE)," and "UNL PS BURG TOOLS." The docket pages do not include any details about these crimes, but the pages show when events in the case happened, including the

---

[7] It looks like the first letter ("A") of these first four crimes was cut off from the copy of the exhibit in the record. Appellant does not argue that the jury had clearer documents.

assignment of counsel and the entry of pleas. The docket page for the armed robbery shows that Appellant was assigned counsel and pled not guilty but then changed his plea to guilty. It appears that all of the other cases ultimately either were "placed in the file" or resulted in guilty pleas with sentences imposed concurrent to the sentence for the first case involving "RMED ASSLT DWELL HOUSE." Page 18 of the exhibit is entitled "Notice of Assignment of Counsel," but it appears to pertain to four of the docket cases other than the armed robbery, with handwritten notations of the case numbers and "asslt dwell house," "A&B D/W," "A&B D/W" again, and "armed asslt int murder." The last page of the exhibit certifies that the document is a true copy of the indictment and docket entries and certifies that the docket indicates that Appellant was represented by counsel in the "criminal case(s)."

(a) Appellant argues that the trial court committed plain error by admitting Exhibit 158 into evidence, because the exhibit showed that he had been convicted of crimes besides the armed robbery. See OCGA § 24-1-103 (d) (providing for plain error review of alleged

evidentiary errors that were not preserved for ordinary review by a timely objection at trial).[8] In reviewing this claim of evidentiary plain error, we use the same test that we used in Division 2 above to evaluate Appellant's claim of plain error under OCGA § 17-8-57 (b). See, e.g., *McKinney*, 307 Ga. at 134. That test requires Appellant to show, among other things, that the alleged error "affected his substantial rights," meaning that "Appellant must make an affirmative showing that the error probably did affect the outcome below." Id. at 135 (citation and punctuation omitted).

The other docket notations in Exhibit 158 did not include any factual details of other crimes, and even the names of the crimes were abbreviated. Neither the prosecutor nor anyone else ever mentioned other crimes during the trial, and the trial court gave a limiting instruction telling the jurors to consider the exhibit only for the purpose of the charges of felony murder based on possession of a

---

[8] Appellant also argues that Exhibit 158 was insufficient to prove that he was a convicted felon. Because Appellant was not convicted of or sentenced on the felony murder counts based on possession of a firearm by a convicted felon, see footnote 1 above, this contention is moot. See *Mann v. State*, 307 Ga. 696, 699 (838 SE2d 305) (2020).

firearm by a convicted felon. Even if we assume, dubiously, that the jurors parsed through the lengthy exhibit and discerned the likely meanings of the abbreviated crimes that no one had ever mentioned, it is not probable that this information had any effect on the verdicts. Accordingly, Appellant has failed to establish plain error.

(b) Appellant also argues that his trial counsel provided ineffective assistance by failing to object to the admission of Exhibit 158, because it contained references to his other crimes. But even assuming that counsel's performance was deficient because he failed to object to the exhibit's references to other crimes, Appellant's ineffective assistance claim fails for the same reason that his related plain error claim failed: he cannot show that it is probable that those references had any effect on the jury's verdicts. See *Mohamed v. State*, 307 Ga. 89, 94 (834 SE2d 762) (2019) (equating "'the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim'" (citation omitted)). See also *Bentley v. State*, 307 Ga. 1, 8-9 (834 SE2d 549) (2019) (holding that the appellant failed to show prejudice based on counsel's failure to

stipulate to his status as a convicted felon because the crimes used to establish that status were "identified only twice in passing" and "were not emphasized" by the prosecutor, and the trial court gave a limiting instruction).

4. The trial court sentenced Appellant as a recidivist under OCGA § 17-10-7 (a), (b), and (c).[9] Appellant argues that his recidivist

---

[9] OCGA § 17-10-7 provides in pertinent part:

(a) Except as otherwise provided in subsection (b) . . . of this Code section, any person who, after having been convicted of a felony offense in this state or having been convicted under the laws of any other state or of the United States of a crime which if committed within this state would be a felony and sentenced to confinement in a penal institution, commits a felony punishable by confinement in a penal institution shall be sentenced to undergo the longest period of time prescribed for the punishment of the subsequent offense of which he or she stands convicted, provided that, unless otherwise provided by law, the trial judge may, in his or her discretion, probate or suspend the maximum sentence prescribed for the offense.

(b) (1) As used in this subsection, the term "serious violent felony" means a serious violent felony as defined in subsection (a) of Code Section 17-10-6.1 [which defines "serious violent felony" to include murder and armed robbery].

(2) Except as provided in subsection (e) of Code Section 17-10-6.1 [which allows the judge to depart from the mandatory minimum sentence when the prosecuting attorney and the defendant have agreed on a sentence], any person who has been convicted of a serious violent felony in this state or who has been convicted under the laws of any other state or of the United States of a crime which if committed in this state would be a serious violent felony and who after such first conviction subsequently

sentencing was improper because the State failed to show that he was represented by counsel and waived his constitutional rights when he entered the guilty pleas that resulted in his prior convictions. When at sentencing and on direct appeal a defendant disputes the use of a prior felony conviction by guilty plea to impose a recidivist sentence, "the burden is on the State to prove both the existence of the prior guilty plea[] and that the defendant was represented by counsel." *Nash v. State*, 271 Ga. 281, 285 (519 SE2d 893) (1999). The State can meet its burden by introducing a transcript of the plea hearing, a docket entry, or another official

---

commits and is convicted of a serious violent felony for which such person is not sentenced to death shall be sentenced to imprisonment for life without parole. Any such sentence of life without parole shall not be suspended, stayed, probated, deferred, or withheld . . . .

. . .

(c) Except as otherwise provided in subsection (b) . . . of this Code section . . . , any person who, after having been convicted under the laws of this state for three felonies or having been convicted under the laws of any other state or of the United States of three crimes which if committed within this state would be felonies, commits a felony within this state shall, upon conviction for such fourth offense or for subsequent offenses, serve the maximum time provided in the sentence of the judge based upon such conviction and shall not be eligible for parole until the maximum sentence has been served.

document showing that the defendant had counsel or waived his right to counsel. See *Beck v. State*, 283 Ga. 352, 354 (658 SE2d 577) (2008). If the State makes that showing, a presumption of regularity applies to the plea proceeding, and it is then the defendant's burden "to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea." *Nash*, 271 Ga. at 285. See also *Robinson v. State*, 283 Ga. 229, 231 (657 SE2d 822) (2008).[10]

Appellant's recidivist sentences were based on State's Exhibit 158 and four exhibits of certified court records from Massachusetts that the State introduced at the sentencing hearing, including Exhibits 163 and 166. As discussed in Division 3 above, Exhibit 158 shows that Appellant was charged with armed robbery (which is a "serious violent felony" triggering recidivist sentencing for his

---

[10] At the sentencing hearing, Appellant's trial counsel objected to the use of the evidence of Appellant's prior convictions, but the objection was not clearly based on the issues Appellant raises on appeal. Appellant therefore argues this claim as both error by the trial court and ineffective assistance of counsel to the extent that trial counsel's objection was insufficient to preserve the claim for appeal. Because the trial court did not err in sentencing Appellant as a recidivist, we will assume that counsel's objection was sufficient to preserve the claim for appeal.

murder and armed robbery convictions under OCGA § 17-10-7 (b)), was assigned counsel, eventually pled guilty, and was convicted and sentenced to serve between six and 1sixteen years in prison.

As explained above, Exhibit 158 also includes docket sheets for 11 other cases. Exhibit 163 includes more details about the crimes involved in some of those cases, including armed assault in a dwelling house. The docket sheet for the "RMED ASSLT DWELL HOUSE" case in Exhibit 158 shows that in 1991, Appellant was assigned counsel in the case, first pled not guilty, and then changed his plea to guilty and was convicted and sentenced to serve 16 years in prison. The indictment for this felony is part of Exhibit 163 and alleges that Appellant entered someone else's house with a knife and assaulted a person inside. Finally, Exhibit 166 shows that Appellant pled guilty to unarmed robbery in 2003 and was sentenced to serve eight to nine years in prison; the final page of that exhibit certifies that Appellant was represented by counsel in the case.

With these exhibits, the State proved both the existence of Appellant's three guilty pleas resulting in felony convictions and

that he was represented by counsel in those cases.[11] Appellant failed to present any evidence to overcome the resulting presumption of regularity. Accordingly, he has not shown that the trial court erred by sentencing him as a recidivist. See *Robinson*, 283 Ga. at 231.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 29, 2020.
Murder, Cobb Superior Court. Before Judge Flournoy.
*David D. Marshall*, for appellant
*Joyette M. Holmes, District Attorney, Amelia G. Pray, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.

---

[11] The State also introduced two other exhibits to show Appellant's prior convictions. We need not consider those exhibits or the other crimes shown by Exhibits 158 and 163 because the felony convictions for armed robbery, armed assault in a dwelling house, and unarmed robbery are sufficient to mandate the recidivist sentences that Appellant received.