312 Ga. 31
FINAL COPY

S21A0454.  MOON v. THE STATE.

ELLINGTON, Justice.

A Chatham County jury found Walter Terry Moon, Jr., guilty of murder and other offenses in connection with the shooting deaths of Emily Pickels and Michael Biancosino. Moon challenges the sufficiency of the evidence, and he contends, among other things, that the trial court erred by denying his motions to suppress evidence and to sever a count of the indictment, by admitting evidence that he committed a prior crime, and by removing a holdout juror during deliberation without sufficient cause. We agree that the trial court abused its discretion in removing the holdout juror, and because the error is presumed harmful, we reverse Moon's convictions, address those issues likely to recur upon retrial, and remand for a new trial.[1]

---

[1] On January 22, 2014, a Chatham County grand jury returned an 18-

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed as follows. On September 1, 2012, Michael Biancosino drove Emily Pickels home in his white Buick Riviera. At about 3:30 a.m., he stopped the car about 100 feet

count indictment against Moon. He was charged with malice murder (Counts 1 and 2); felony murder predicated on aggravated assault (Counts 3 and 4); felony murder predicated on possession of a firearm by a convicted felon (Counts 5 and 6); possession of a firearm during the commission of a crime (Counts 7, 8, 11, and 12); aggravated assault (Counts 9 and 10); possession of marijuana with intent to distribute (Count 13); possession of a firearm by a convicted felon during the commission of a crime (Counts 14 and 15); possession of a firearm by a convicted felon (Counts 16 and 17); and attempt to obtain a firearm by a convicted felon (Count 18). The State indicted Moon as a recidivist, listing six prior convictions. At a jury trial beginning on June 2, 2016, Moon was found guilty on all counts, except Count 13, which was nolle prossed. On August 17, 2016, Moon was sentenced as a recidivist to consecutive terms of life without parole for malice murder (Counts 1 and 2); 15 years in prison for possession of a firearm by a convicted felon during the commission of a crime (Count 14), to run consecutively to Count 1; 15 years in prison for possession of a firearm by a convicted felon during the commission of a crime (Count 15), to run consecutively to Count 2; five years in prison for each conviction for possession of a firearm by a convicted felon (Counts 16 and 17) and the attempt to obtain a firearm by a convicted felon (Count 18), to run consecutively to Count 15 and each other. The felony murder charges (Counts 3 through 6) were vacated by operation of law, and the remaining charges (Counts 7 through 12) merged. Moon filed a motion for new trial on August 16, 2016, through trial counsel. After new counsel entered an appearance, Moon twice amended his motion for a new trial, adding claims that his trial counsel was ineffective. Following hearings on the motion for a new trial in June and September 2018, the trial court denied the motion on August 6, 2020. Moon filed a notice of appeal on September 4, 2020, and the case was docketed to the term of this Court beginning in December 2020. Oral argument was heard on April 22, 2021.

from Pickels's apartment in Frazier Homes in Chatham County. Before Pickels could get out, a masked gunman crept up to the car and opened fire with an SKS or AK-47-type rifle. The gunman walked around the Buick, firing into it repeatedly. As Biancosino tried to drive away, the gunman kept firing. Biancosino's Buick rolled to a stop after it crashed through a brick wall. The gunman ran back to a waiting car and got in the passenger side. The car then sped away. Biancosino and Pickels died as a result of multiple wounds caused by high-velocity rounds. After a lengthy investigation, the police determined that the gunman was Sidney Grant.[2] Grant and his accomplice, appellant Walter Moon, had been out that night looking for Ron Allen with the intention of killing him. Allen, who frequented the area where the crimes occurred, owned a car that was almost identical to the one occupied by Pickels and Biancosino.

Based on witness testimony and surveillance video from the

---

[2] Grant was not indicted in connection with the shooting deaths of Biancosino and Pickels because he was shot to death on March 16, 2013.

area where the shooting occurred, the police determined that the gunman had been driven to and from the scene of the shooting in a silver 2012 Chevrolet Sonic. Surveillance video showed the Sonic following the Buick to the apartment complex and the gunman emerging from the passenger side of the Sonic. Information about the car led the police to Kiawana Williams, who was then living with Grant. The police learned that Williams was driving cars rented for her by her mother. On August 31, 2012, Williams started driving the Sonic because the silver Dodge Caliber that she had been driving had developed brake trouble. Williams testified that she often loaned her rental cars to Grant and Moon while she was at work. She also purchased pre-paid phones for the men. Williams said that, just hours before the shooting, she loaned the Sonic to Grant and Moon, and that Moon was driving. Another witness also testified that he had seen Moon and Grant in the car together on the night of the shooting, and that Moon was driving.

A few days after the shooting, the police searched the Sonic and Williams's home. They found a camouflage mask in the car.

4

Saliva found inside the mask tested positive for Grant's DNA. The police found Moon's fingerprints on the exterior of the car and on a soda can in the car's console. The police also found receipts in the car indicating that Grant had the car's windows tinted before the shooting and the windshield repaired shortly after the shooting. One witness testified to seeing a "finger-sized" hole in the glass. Another witness identified Grant as the person who had the windshield repaired.

The police also executed a search warrant on Moon's home. They recovered pre-paid cell phones from Moon's bedroom. In a locked shed on the property, the police found high-velocity rounds like those used to kill the victims, a bullet-proof vest, and two loaded rifles capable of firing the high-velocity rounds. Forensics experts determined that neither weapon, however, had fired the bullets that killed the victims. Based on information from Williams and other witnesses, the police determined that the phones had been used by Grant and Moon. The police determined that one of the phones had connected to a cell tower three blocks from the scene of the shooting

around the time of the shooting. The phones also showed frequent text activity between Moon and Grant before and after the shooting, but not during the shooting.

After Moon was arrested, Tarus Green, an acquaintance of Moon's who was also in jail on unrelated charges, told a detective that Moon said that he and Grant had committed the crimes using a "chopper," which is slang for a semi-automatic rifle. According to Green, Moon was the driver, Grant was the shooter, and the two disposed of the rifle after the shooting. Another witness testified that, shortly after the shooting, Moon had negotiated with her to buy an AK-47 rifle. Text messages of their communications were introduced in evidence.

Several reluctant witnesses testified about Grant and Moon's long friendship and Grant's animosity toward Allen. A witness testified that Grant was "out to get" Allen based on a belief that Allen had disrespected the memory of Grant's murdered brother, Michael. Allen was a close friend of Michael's when Michael was killed. Grant believed that Allen should have avenged Michael's

murder and that his failure to do so was an insult. Allen often visited a store near where the shooting occurred and was known to drive a white Buick Riviera that looked like the one driven by Biancosino. A few days before the shooting, a witness saw Moon and Grant standing beside a silver Dodge Caliber parked near an apartment complex that Allen was known to frequent. A few days after the shooting, Allen sold his car.

The State also introduced evidence of Moon's prior felony convictions for aggravated assault. In 2005, Moon had fired an AK-47 into a car where three men were sitting. Moon's accomplice drove him to the scene of the shooting in a car that the accomplice's aunt had rented. Moon shot the men (all of whom survived their grievous injuries) because he was angry with them for implicating him in the theft of pit bull puppies.

1. Moon contends that the evidence, which he describes as "circumstantial at best," was insufficient to prove his guilt beyond a reasonable doubt and did not exclude every reasonable hypothesis save that of his guilt. Specifically, Moon argues that the evidence

was insufficient to show that he participated in the murders or that he possessed or attempted to possess any firearms. We disagree.

The legal principles applicable to our review of this claim of error are well established.

> When we consider the sufficiency of the evidence as a matter of federal due process, our review is limited to whether the trial evidence, when viewed in the light most favorable to the verdicts, is sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact. In addition, as a matter of Georgia statutory law, "to warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Whether alternative hypotheses are reasonable, however, is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law.

(Citations and punctuation omitted.) *Frazier v. State*, 308 Ga. 450, 452-453 (2) (a) (841 SE2d 692) (2020). Further, "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA §

8

16-2-20 (a).

To convict Moon of malice murder and possession of a firearm by a convicted felon during the commission of a crime, the State was not required to prove that Moon personally fired the shots that killed Pickels and Biancosino, only that he was a party to the crimes, which, in this case, meant that he intentionally aided or abetted in the commission of the crimes or intentionally advised, encouraged, or counseled Grant to commit the crimes. See OCGA § 16-2-20 (b) (3), (4); *Bryant v. State*, 296 Ga. 456, 458 (1) (769 SE2d 57) (2015) ("A person who does not directly commit a crime may be convicted upon proof that a crime was committed and that person was a party to it." (citation and punctuation omitted)). "While mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during and after the offense." (Citation and punctuation omitted.) *Parks v. State*, 304 Ga. 313, 315-316 (1) (a) (818 SE2d 502) (2018). See also *Broxton v. State*, 306 Ga. 127, 136 (4) (829 SE2d 333) (2019).

9

The evidence presented at trial supported the jury's rational finding, beyond a reasonable doubt, that Moon, a convicted felon, was a party to Grant's act of murdering Pickels and Biancosino by repeatedly shooting them with a rifle. Moon told Green that he and Grant had committed the crimes, that he drove Grant to and from the scene of the shooting, and that the two had disposed of the murder weapon. Witnesses saw Moon and Grant together in Williams's Sonic before the shooting, and forensic evidence indicated that both Grant and Moon had been in the car. The jury could also infer from text messages exchanged between cell phones used by Moon and Grant that they were together when the shooting occurred. Moreover, cell phone location data placed one of the cell phones in close proximity to the scene of the shooting near the time that the shooting occurred. The police later found two loaded rifles, high velocity rounds, and a bullet-proof vest in a locked shed at Moon's home. Although neither Moon nor Grant knew the victims, witnesses testified that Grant wanted to kill Allen, who drove a Buick that looked like Biancosino's Buick. Moon and Grant, who

10

were close friends, were seen a few days before the shooting near Allen's apartment complex, standing beside one of Williams's rental cars. Allen also sold his Buick shortly after the shooting, from which the jury could infer that Allen believed that Grant and Moon — neither of whom had yet been arrested — were still looking for him. Finally, the jury could infer from the evidence of Moon's prior crime of firing an AK-47 into a car of people that Moon shared Grant's criminal intent.

Viewed as a whole, this evidence was sufficient to support Moon's convictions both as a matter of due process and under OCGA § 24-14-6 for murder, possession of a firearm by a convicted felon during the commission of a crime, and possession of a firearm by a convicted felon.[3] See *Frazier,* 308 Ga. at 452-453 (2) (a). However, as

---

[3] Moon was convicted of four counts of possession of a firearm by a convicted felon. Two of these, Counts 14 and 15, were charged pursuant to OCGA § 16-11-133 for Moon's possession of a firearm by a convicted felon during the murders of Pickels and Biancosino. The other two, Counts 16 and 17, were charged pursuant to OCGA § 16-11-131 for Moon's possession of two rifles found in a locked shed at his residence. Although we find the evidence presented at trial sufficient to support these convictions, OCGA § 16-11-131 (b) permits only one conviction for the simultaneous possession of multiple firearms. See *Coates v. State*, 304 Ga. 329, 331-332 (818 SE2d 622) (2018).

11

Moon contends, the State failed to prove venue as to Count 18, which charged Moon with attempting to purchase an AK-47 rifle five days after the murders. In support of this charged crime, the State presented the testimony of one witness, as well as evidence of text messages exchanged between the witness and Moon. The witness did not testify that either she or Moon were in Chatham County during their negotiations concerning the gun. And there is nothing in the witness's testimony or the text messages from which the jury could infer that she or Moon were in Chatham County. Because the State failed to prove venue, Moon's conviction for this offense must be reversed. However, he may be retried for this offense.[4]

Because we are reversing these convictions, we do not need to address the merger error.

[4] The Georgia Constitution requires that venue in all criminal cases must be laid in the county in which the crime was allegedly committed. See Ga. Const. of 1983, Art. VI, Sec. II, Par. VI. See also OCGA § 17-2-2. Although venue must be proved beyond a reasonable doubt at trial, "venue is not an element of the offense and does not prove or disprove the defendant's guilt. Reversal due to improper venue is not a resolution of some or all of the elements of the offense charged." (Citations and punctuation omitted.) *Grier v. State*, 275 Ga. 430, 431 (1) (569 SE2d 837) (2002). Thus, the grant of a new trial as to Count 18 is not a reversal due to insufficient evidence that would preclude a retrial. See id. See also OCGA § 16-1-8 (d) (1) ("A prosecution is not barred . . . if . . . [t]he former prosecution was before a court which lacked

2. Moon contends that the trial court erred in removing a lone holdout juror during deliberations without conducting a sufficient inquiry and without having a good or legal cause to do so. For the reasons that follow, we agree.

OCGA § 15-12-172 provides in pertinent part:

> If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated. . . .

As this Court has explained:

> The question of whether to remove a juror is a matter committed to the trial court's discretion, even after jury deliberations have begun. However, there must be some sound basis upon which the trial judge exercises his discretion to remove the juror. A sound basis may be one which serves the legally relevant purpose of preserving public respect for the integrity of the judicial process. Where the basis for the juror's incapacity is not certain or obvious, some hearing or inquiry into the situation is appropriate to the proper exercise of judicial discretion. Dismissal of a juror without any factual support or for a legally irrelevant reason is prejudicial. Both the need for investigation and the possibility of harmful error are heightened when a jury has begun deliberations or when

jurisdiction over the accused or the crime[.]"). It follows that the State is authorized to retry Moon for this offense in the proper venue.

13

a jury is deadlocked.

(Citations and punctuation omitted.) *Mills v. State*, 308 Ga. 558, 560 (2) (842 SE2d 284) (2020). See also *Hill v. State*, 263 Ga. 37, 41 (8) (427 SE2d 770) (1993) (A trial court has an obligation to investigate the need to excuse an allegedly incapacitated juror, and this is "especially true where the jury has begun its deliberations and the juror has participated in those deliberations." (citation and punctuation omitted)). Further, because removing a dissenting juror when the jury is deadlocked risks violating a defendant's right to a unanimous verdict, a trial judge must exercise the utmost care in determining that good cause exists before removing the juror. See *Ramos v. Louisiana*, __ U. S. __ (140 SCt 1390, 1397, 206 LE2d 583) (2020) (The Sixth Amendment right to a jury trial requires a unanimous verdict to convict a defendant of a "serious offense" in state court as well as federal court.); *United States v. Brown*, 996 F3d 1171, 1184 (III) (A) (11th Cir. 2021) ("[T]o remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict." (citation and

punctuation omitted)).

(a) *The record.* The jury began its deliberations at 6:00 p.m. on June 13, 2016, and the jurors deliberated for about 50 minutes before being sent home for the evening. The jury returned the following morning at 8:00. Shortly thereafter, the trial court excused a juror who had vacation plans and replaced that juror with an alternate. At 8:38 a.m., the judge instructed the jury to start its deliberations anew.

At 10:05 a.m., Juror No. 4, the foreperson, sent a note to the judge asking to see two items of evidence: the video-recorded police interview with Moon and a transcript of Green's April 13, 2013 statement to the police. The judge informed the jury that there was no transcript of Green's statement and that Moon's interview was an hour and a half long. If the jurors wanted to review Moon's interview, they would be required to watch all of it. The judge told the jury to return to the jury room, to consider whether they wanted to watch all of the interview, and to let her know if they did. At 10:15 a.m., the jury continued its deliberations. The jury did not renew its

request to see Moon's interview. While the jury deliberated, the judge considered letting the remaining alternate juror go home.

At 11:28 a.m., the foreperson sent the judge another note. The note stated:

> [O]n counts 16, 17, and 18 the jury has made a unanimous decision. [O]n counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, and 15 the jury does not have a unanimous decision. There is some adamant opinion that is not in agreement with the other jurors.

The judge discussed the note with counsel, and concluded that it was too early for an *Allen* charge.[5] The judge then told the jury:

> [Your note] tells me that you have a unanimous verdict as to certain counts and that you do not have a unanimous decision as to other counts. So as to the ones that you have a unanimous verdict, that's fine. . . . As to the counts, though, for which you have not reached a unanimous

---

[5] An *Allen* charge typically informs the jury that a unanimous verdict is required, and instructs the jury, among other things, that "[w]hile this verdict must be the conclusion of each juror and not a mere acquiescence of the jurors in order to reach an agreement, it is nevertheless necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with a proper regard for and deference to the opinion of each other." See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.70.70 Jury (Hung) (updated January 2021). See also *Allen v. United States*, 164 U. S. 492, 501 (17 SCt 154, 41 LE 528) (1896); *Romine v. State*, 256 Ga. 521, 526 (350 SE2d 446) (1986) (noting that it is "'somewhat imprecise to refer to a single *Allen* charge,'" as more than a century of judicial interpretation has "'produced a variety of permutations and amplifications of the original wording'" (citation omitted)).

verdict, my instruction to you is that you're going to need to go back in there and continue your deliberations.

The jury returned to the jury room at 11:35 a.m., and the judge sent them to lunch at 11:50 a.m. The jury resumed deliberations at 1:20 p.m. Then, at 2:45 p.m., another juror, Juror No. 11, sent the judge a note stating: "I need to speak to you in private." The judge had the jury cease its deliberations and asked Juror No. 11 to come into the courtroom. When the judge asked the juror if he had something to tell her, he responded:

> Well, we just have a situation in there. We've all come to an agreement, but [there is] one person that in my mind is just being just – they know – we've all talked to her. And they know what we're saying. But they're just being difficult. Or not difficult, just stubborn.

Juror No. 11 did not identify the "one person" by name or juror number, but he indicated that she was female and suggested that she was the lone holdout juror. He complained that the juror was "not making any sense," and was "refusing to look at the facts as each one of us has pointed out." When the judge asked if the alleged holdout juror was refusing to deliberate, Juror No. 11 responded

17

that she had been participating in deliberations until about "30 minutes ago." After that, she had formed an opinion about the verdict. At 2:52 p.m., the judge sent Juror No. 11 back to the jury room and had the jury continue its deliberations.

While the jury was out, the prosecutor argued that the alleged holdout juror should be removed for cause for refusing to engage in deliberations based on the evidence. Defense counsel objected, arguing that the jury had been deliberating "for hours and hours," that he had seen no evidence of misconduct, and that the juror was following her oath. After hearing from counsel, the judge called for a brief recess to research their arguments. At 3:25 p.m., the foreperson sent another note to the judge. This note read:

> [A]ll jurors have expressed their decision and reasons therefor concerning certain counts. However, there is not a unanimous agreement as to these certain counts. Since the majority of jurors have been unable to change the mind of the minority, what can be done at this point?

Although this note did not refer to a single holdout juror, the prosecutor moved to excuse the alleged holdout juror, arguing that the juror was not willing to deliberate. Defense counsel responded

18

that "11 of them have come to a conclusion contrary to the one. What we have here is a juror following their oath." Defense counsel argued that the complaining jurors were frustrated because they did not have a unanimous verdict on all counts. Defense counsel then moved for a mistrial. The judge announced that she needed to do some fact-finding to determine if the juror was a holdout or if she was refusing to deliberate. Defense counsel again objected, arguing that there "has been not even a hint or allegation of juror misconduct. This juror, whoever he or she is, has in fact deliberated. And they have reached verdicts." Defense counsel renewed his motion for a mistrial, but the trial court did not rule on it.

The judge had the foreperson return to the courtroom so she could inquire further about his note. The foreperson told the judge that the jury had reached a unanimous verdict on three counts of the indictment. On a slip of paper, he wrote that their vote was "11 and 1" as to the remaining counts. The foreperson also informed the judge that their votes had "basically been that way since the beginning." The foreperson returned to the jury room at 3:43 p.m.,

and, thereafter, the judge heard arguments from counsel. The prosecutor argued that the alleged holdout juror should be questioned, and if she was refusing to deliberate, removed; defense counsel objected to that juror being "browbeaten" into changing her mind. He argued that it was clear that the jurors had all reached a decision on their verdicts, just not a fully unanimous one. Defense counsel renewed his motion for a mistrial, which the judge again did not address.

At 4:07 p.m., the trial court called the foreperson back to the courtroom and had him identify the alleged holdout juror. He identified her as Juror No. 7. The foreperson then told the judge that Juror No. 7 was, in fact, participating in deliberations, but that "she's just not agreeing with the facts as we see the facts." The foreperson then volunteered that Juror No. 7 had mentioned that she had "been to 15 funerals of friends who were killed already this year," and opined that the juror's "feelings" may have been affecting her decision-making. After the foreperson returned to the jury room, the judge announced that she had decided to interview Juror No. 7.

Defense counsel objected and argued for a mistrial, explaining:

> There's no indication that she's refused to discharge her duty. There's no reason. But now she's been identified. And now we know that it's a black juror. And now there is going to be a redoubled effort to remove [Juror No. 7] and replace her with the last alternate and further change the composition of this jury. There is no reason to bring her out here and begin inquiring into why she feels the way she does.

The judge had Juror No. 7 brought into the courtroom. The judge asked her if she could "attempt to reach a verdict on the evidence in this case" and the juror nodded her head affirmatively and then, when prompted by the judge to speak, responded "[Y]es ma'am." The following exchange then occurred:

> COURT: But I need for you to tell me. All right. If you are instructed to do so, can you go in and deliberate? In other words, would you go back in and deliberate with your fellow jurors?
> JUROR: No, ma'am.
> COURT: Okay. Do you understand what I mean when I'm saying deliberate?
> JUROR: Uh-huh (affirmative response).
> COURT: What do I mean?
> JUROR: Discuss it.
> COURT: To discuss it. Okay. All right. So are you willing to participate with the other jurors and have a discussion with the other jurors? And I just need a yes or a no.
> JUROR: Yes.

COURT: You are. Okay. So if deliberating means to discuss it, if you're instructed to do so, will you go back in and deliberate with your fellow jurors? Yes or no. There's no right or wrong. I just need to know the answer to it.
JUROR: Yes.
COURT: Yes, you are. Okay. All right. So to go through the questions again, can you attempt to reach a verdict on the evidence? Yes or no.
JUROR: Yes.
COURT: If you're instructed to go in and deliberate, would you do so?
JUROR: Yes.
COURT: And are you willing to participate with the other jurors?
JUROR: Yes.
COURT: Okay. All right. Thank you very much. You can step in.

At 4:17, the jury resumed its deliberations. The prosecutor again argued that Juror No. 7 should be excused. The prosecutor urged the judge to consider the juror's equivocation and demeanor, and asserted that "this juror was laughing during the jury charge." The prosecutor further asserted: "when [Juror No. 7] first came out, in addition to smiling, she refused to verbally answer this Court's questions until instructed to do so. I think all of these behaviors and all of the other evidence in the record at this point, there is sufficient

cause to remove her[.]"[6] Defense counsel again objected, stating that he had seen nothing unusual about Juror No. 7's behavior. Moreover, although it was clear that the juror had agreed to deliberate, he argued, it was also clear that the entire jury had already reached a decision on each count of the indictment, but that the verdict was not unanimous on a number of counts. The judge did not rule on counsels' arguments.

At 5:28 p.m., the foreperson sent another note to the judge, stating:

> [O]ne juror is continuing to not agree with the other jurors about 14 counts. . . . All other jurors have used facts and circumstances to make their decision. One juror has indicated that her decision will not change to agree with other jurors. This juror is adamant about her decision. Therefore a unanimous decision is not possible at this time.

The prosecutor again moved to excuse Juror No. 7, and defense counsel objected and argued: "The juror has deliberated. . . . I ask

_____

[6] The record does not reflect that Juror No. 7 refused to answer the judge's questions; rather, it indicates that she responded nonverbally at first, by nodding her head. When the judge asked her to respond with a "yes" or "no," the juror complied.

23

the Court to go ahead and take a verdict on the three counts and grant a mistrial as to the remaining counts." The judge denied defense counsel's motion for a mistrial and decided to call Juror No. 7 back to the courtroom for further inquiry. Defense counsel objected to what he believed was the prosecutor's "systemic attempt to remove a juror."

When Juror No. 7 returned to the courtroom, the judge asked the following:

> COURT: And what I'm trying to find out for me is have you been able to actually deliberate. In other words, are you going through the evidence with your fellow jurors, or are you not able to? Are you able to, or are you not able to?
> JUROR: Yes, I am.
> COURT: You are able to. Okay. All right. In that case then I'm not going to ask anything more than that.

After this exchange, the judge sent the jury home for the evening. The judge informed counsel that she was considering giving the jury an *Allen* charge when the jury returned the following morning.

At 9:24 a.m. on the second day of deliberations, after the jurors had been deliberating for about 20 minutes, another juror, Juror No.

12, sent the judge a note. This note stated:

> I need to express to you several concerns that I have about one of the jurors.
>
> First, she told the jurors yesterday that she has had 15 friends murdered during the past several years. She also relayed the information to us that her sister's boyfriend was shot right after taking her sister home. She was upset that her sister had been questioned about the shooting.
>
> Second, she told us that she knows about all the "talking" that goes on in the jail because she has been there. She said she was put in jail for violating her parole. (We asked no further questions.)
>
> She also admitted that she did not share any of this information during the selection process when asked about being a party to or being aware of murders close to your family.
>
> In addition, she has been consistently late, almost every day. She would just sit in the jury room during the trial and listen to television shows on her phone.
>
> I am concerned that she is mentally unstable and not able to look at this trial with unbiased feelings because of her life situations.

After reading the note, the judge asked counsel for their thoughts.

The prosecutor argued that Juror No. 7 should be excused based on the allegations in Juror No. 12's note, as well as on the ground that Juror No. 7 was refusing to deliberate. She contended that Juror No. 7 had withheld vital information during the selection process.

25

Defense counsel disagreed, arguing that the prosecution had run a background check on each juror and there was no evidence that Juror No. 7 had a felony conviction. Further, he believed that it was Juror No. 12 who seemed "wound up," and he posited that she and the other jurors were ganging up on Juror No. 7 because she did not agree with them.

The judge decided to question Juror No. 12 and then speak again with the foreperson. The judge asked Juror No. 12 only one question, and that was whether she could identify the juror about whom she had complained. Juror No. 12 also identified the alleged holdout as Juror No. 7 and then returned to the jury room. The judge had the foreperson return to the courtroom. The judge read Juror No. 12's note to the foreperson and asked him whether the note was a "fair explanation" of what was happening in the jury room. The foreperson responded that it was a "very true statement[.]" After the foreperson returned to the jury room, the judge entertained arguments from counsel.

The prosecutor argued that Juror No. 7 should be replaced

based on evidence that she was not impartial, lacked candor, was not participating in deliberations, and had behaved improperly. Defense counsel responded that Juror No. 7 had deliberated and had reached a decision. In fact, all of the jurors had reached decisions, but they were not unanimous; the jury was deadlocked. He argued that the three jurors who had complained about Juror No. 7 did so only after they all had reached decisions on each count of the indictment. Further, defense counsel asserted that the prosecutor had determined that the juror did not have a felony conviction.

After hearing from counsel, the judge stated that she had noticed that Juror No. 7 had laughed and smiled inappropriately at times during the trial and was also consistently the last juror to return to the jury box. The judge then announced that she would excuse Juror No. 7, explaining:

> [W]e have the comments regarding [Juror No. 7's] friends that have been murdered over the last few years, her equivocation yesterday as to whether she would — could deliberate or not. She, you know — again it wasn't enough at that point. But I think when I add it with all the other facts and her apparent failure to disclose the situation with her sister's boyfriend, all of those factors together

27

come together. And so I am going to excuse this juror. Again, I am doing so — I would also point out that she has apparently from our timeline of what's been happening here — because this has been going on since really just a few hours into deliberations. So this is not a situation where we've had a group of people that have been deliberating for two days and have, you know, reached decisions and now are just arguing over it. This is something that started rearing its head very[,] very early on in the process. And so based on all – for all of those reasons I am going to excuse this juror.

The judge added that her decision was also based on Juror No. 7's countenance and demeanor, and not just the words she spoke. The judge, however, did not elaborate on what the juror's countenance and demeanor appeared to be or what she had inferred from it. Defense counsel objected, arguing again that the jury had reached a decision and that the judge was refusing to accept that decision. Thereafter, the judge excused Juror No. 7 without any further inquiry, replaced her with an alternate, and instructed the jury to begin its deliberations anew. Defense counsel again moved for a mistrial, arguing that the judge should have given Juror No. 7 an opportunity to defend herself. Counsel's motion was "noted for the record." About an hour and a half later, the jury indicated that it

28

had a verdict. Before the verdict was read aloud, defense counsel

told the judge the following:

> [E]verything these jurors said this morning that were
> attributed to [Juror No. 7,] [the juror] says are false. She
> says the other jurors refused to deliberate, wouldn't look
> at the evidence. [They said] she was on crack. Accused her
> of knowing Walter Moon and trying to cover for him and
> many other things that were not true.

The judge noted defense counsel's statement for the record and then

read the jury's verdict of guilty as to each count of the indictment.

In its order denying Moon's motion for a new trial, the trial

court stated that it excused Juror No. 7 for these reasons:

> Taking into consideration the concerns of the foreperson
> and [the other two jurors] regarding [Juror No. 7's] ability
> to deliberate fairly and impartially, [the juror's] own
> equivocation regarding whether she would be able to
> participate in deliberations if instructed to do so, [the
> juror's] demeanor and countenance throughout the trial,
> her failure to disclose the situation with her sister's
> boyfriend during jury selection, and the fact that [the
> juror's] opinion was seemingly fixed after only few hours
> of deliberations, the Court exercised its discretion under
> [OCGA §] 15-12-172 to discharge [the juror] and replace
> her with an alternate[.]

(b) *Analysis.* In this case, the State urged the trial court to

remove Juror No. 7 after the jury had begun its deliberations and

after it was deadlocked; therefore, the trial court had a heightened responsibility to perform a thorough investigation into the circumstances surrounding the juror's decision-making to avoid the possibility of harmful error. See *Mills*, 308 Ga. at 560 (2); *Hill*, 263 Ga. at 41 (8). As we have explained "alternate jurors generally should not serve to substitute for minority jurors who cannot agree with the majority, as taking such a minority position does not by itself render a juror incapacitated or legally unfit to serve, and making such a substitution may constitute an abuse of discretion." *Wallace v. State*, 303 Ga. 34, 38 (2) (810 SE2d 93) (2018). Further, removing a dissenting juror when the jury is deadlocked could implicate the defendant's right to a unanimous verdict. See *Brown*, 996 F3d at 1184 (III) (A). The trial court appeared to be aware of its responsibility and made some inquiry. For the following reasons, however, that inquiry fell short and resulted in dismissing Juror No. 7 on a basis that was not legally sound. See *Mills*, 308 Ga. at 559-562 (2) (The trial court's limited inquiry into a juror's possible incapacity fell short of providing a sound basis for her removal.).

First, the record does not support the trial court's conclusion that only Juror No. 7 had formed an opinion that was seemingly fixed after only a few hours of deliberations.[7] Rather, the statements from the foreperson and Juror No. 11 indicated that *all* of the jurors had reached decisions within a few hours of beginning their deliberations and were deadlocked. After the jury returned from lunch on the first day of trial, Juror No. 11 informed the court that

[7] Because a juror's verdict must be based on the evidence in the case, a trial court may excuse for cause a *prospective* juror who has formed a fixed opinion as to the defendant's guilt or innocence prior to hearing any evidence in a case. See *Miller v. State*, 275 Ga. 730, 736 (5) (571 SE2d 788) (2002). But, once a juror has heard the evidence, the arguments of counsel, and the court's instructions on the law, there is no requirement that the juror spend any particular length of time deliberating before forming an opinion as to the defendant's guilt or innocence. Rather, the length of time a deadlocked jury has been deliberating is a factor the trial court may consider when deciding whether to give an *Allen* charge or to declare a mistrial. See, e.g., *Romine*, 256 Ga. at 525-526 (1) (c) ("Considering the length and complexity of the trial, the length of time the jury deliberated before declaring itself deadlocked, and the amount of progress made in the interim, we find no abuse of discretion in the court's refusal to declare a mistrial."). In fact, in giving an *Allen* charge, the trial court must be careful to explain that, although the jurors should consider the opinions of other jurors during deliberations, they must never surrender their honest opinions for the sake of expediency. See *Sears v. State*, 270 Ga. 834, 837-838 (1) (514 SE2d 426) (1999) (An *Allen* charge should not "put pressure" on the jurors to reach a particular verdict, "exhort the minority to reexamine its views in deference to the majority," or to "suggest that the majority's position is correct." Nor should it urge the jurors "to abandon an honest conviction for reasons other than those based upon the trial [evidence] or the arguments of other jurors." (citations and punctuation omitted)).

"[w]e've all come to an agreement," but that one juror was being "stubborn." Moreover, the foreperson informed the court that Juror No. 7 had made up her mind after the jurors returned from lunch, indicating that she had deliberated for about as long as the other jurors had before they also made up their minds. Indeed, the foreperson explained at one point that the votes had "basically been that way [11 to 1] since the beginning."

Further, both the foreperson and Juror No. 11 informed the judge that Juror No. 7 had, in fact, participated in deliberations, but that she was not persuaded by the other jurors' arguments as to several of the counts. The foreperson explained that "she's just not agreeing with the facts as we see the facts." Additionally, the record shows that Juror No. 7's responses to the judge's questions about her ability to deliberate were not equivocal. The record shows that, on one occasion when the judge asked Juror No. 7 whether she could deliberate with the other jurors, she said: "No, ma'am." But the judge then rephrased her question, and the juror responded affirmatively, indicating that she could and would participate in

32

deliberations. The judge asked the question six more times, and each time got an affirmative response. The judge did not indicate at this point that she found the juror's sole "no" response to be evidence of equivocation; rather, given that the judge returned the juror to the jury room to continue deliberations, it appears the judge accepted as credible the juror's many "yes" answers.

Finally, although Juror No. 12 complained that Juror No. 7 watched television shows on her phone in the jury room while on breaks from the trial of the case, she did not say that Juror No. 7 was watching those shows during deliberations. The record also does not show that Juror No. 7 missed or delayed deliberations due to her alleged tardiness. The record before us does not support excusing Juror No. 7 on the ground that she had failed to meaningfully participate in deliberations. Rather, the record shows that the juror had deliberated, but that she reached a different conclusion based on her perception of the evidence. See, e.g., *Mills*, 308 Ga. at 562 (2) ("[N]othing in the jury's notes shows that [the holdout juror] had refused or ceased to participate in the jury's deliberations; rather, it

33

can be reasonably inferred from the jury's communications that [the juror] had reached a decision different from that of the other jurors" based upon her view of the evidence.); *Delgado v. State*, 356 Ga. App. 625, 630 (848 SE2d 665) (2020) (The trial court abused its discretion in dismissing a holdout juror after deliberations had begun; the holdout juror's refusal to change his opinion did not provide good cause for dismissal because he had participated in deliberations for several hours before making up his mind; the juror testified that he had attempted to deliberate with the other jurors, but the deliberations were no longer productive; and the juror's differing opinion was based on the juror's belief as to the credibility of a witness.); *Mason v. State*, 244 Ga. App. 247, 249-250 (1) (535 SE2d 497) (2000) (The trial court abused its discretion in dismissing a holdout juror; the juror's statements that she did not want to deliberate further and would not change her vote did not amount to a refusal to deliberate, considering that she and the other jurors had already deliberated for more than two days and the juror's statements were made after the court had given an *Allen* charge.).

34

Compare *Bethea v. State,* 337 Ga. App. 217, 219-220 (786 SE2d 891) (2016) (The trial court did not abuse its discretion in dismissing a juror who formed an unwavering opinion before fully vetting the evidence, was visibly upset, did not want to talk to the other jurors, equivocated about her ability to participate in deliberations, and adamantly "wanted out" of the process.).

The record also fails to support dismissing Juror No. 7 on the ground of juror misconduct. There is nothing in the record indicating that the judge commented on Juror No. 7's alleged tardiness at any point during the trial. Also, when the prosecutor first argued that Juror No. 7 should be dismissed for laughing and smiling at inappropriate times during trial, and defense counsel countered that he had seen no such behavior, the judge took no action at that time. The judge did not ask the juror about this alleged conduct and made no findings about whether the conduct in fact had happened. Indeed, it was only after the trial court decided to remove Juror No. 7 that she cited the juror's alleged behavior as a rationale for removing her from the jury. Further, the trial transcript does not reflect that the

judge had concerns about Juror No. 7's behavior, countenance, or demeanor during trial or after deliberations had begun. In fact, the judge had contemplated sending the remaining alternate juror home, which suggests that she was not anticipating any problems with Juror No. 7 at that time.

However, Juror No. 12 made other allegations about Juror No. 7 that were affirmed by the foreperson. Juror No. 12 claimed that Juror No. 7 stated the following during deliberations: (1) she "had 15 friends murdered during the past several years"; (2) her "sister's boyfriend was shot right after taking her sister home" and she was upset that "her sister had been questioned about the shooting"; (3) "she knows about all the 'talking' that goes on in the jail because she has been there. She said she was put in jail for violating her parole"; and (4) "she did not share any of this information during the selection process when asked about being a party to or being aware of murders close to your family."

If the record showed that Juror No. 7 had, in fact, lied or purposefully withheld material information during voir dire, the

juror's lack of candor could provide a sound legal basis for excusing her. See, e.g., *Murray v. State*, 276 Ga. 396, 399 (4) (578 SE2d 853) (2003) (A sound legal basis is one that "serve[s] the legally relevant purpose of preserving public respect for the integrity of the judicial process." (citation and punctuation omitted)); *Green v. State*, 298 Ga. App. 301, 302 (1) (680 SE2d 156) (2009) (The trial court had a sound legal basis for dismissing a deliberating juror when, after questioning the juror, the court determined that a clear question concerning the juror's truthfulness in responding to a material voir dire question existed.); *Wooten v. State,* 250 Ga. App. 686, 687 (3) (552 SE2d 878) (2001) (The trial court properly dismissed a deliberating juror when, after questioning him, the court determined that the juror had lied about knowing the defendant); *McGuire v. State*, 200 Ga. App. 509, 510 (3) (408 SE2d 506) (1991) (The trial court properly dismissed a deliberating juror when, after questioning each individual juror about the matter, the court concluded that the juror inspected the crime scene in violation of the court's instructions and had discussed his observations with the

other jurors.).

However, the record before us does not reveal an adequate basis for inferring that Juror No. 7 lied or purposefully withheld material information in response to voir dire questions. There is no evidence in the record that Juror No. 7 had been convicted of a felony or was on parole. To the contrary, the record indicates that the prosecutor had conducted criminal background checks on the jurors and informed the judge during voir dire when a juror failed to disclose his or her criminal record, and that Juror No. 7 was not one of them. Additionally, the judge did not ask Juror No. 7 whether she had made the statements recounted in the third juror's note; whether the statements, if made, were actually true; and, if the statements were true, whether the juror had lied about or purposefully withheld information that either the court or counsel had specifically asked her to disclose.[8]

---

[8] Neither the judge nor the prosecutor identified which voir dire questions would have called for the disclosure of the information Juror No. 7 allegedly withheld. We have reviewed the transcript of voir dire, however, and determined that the jurors were not specifically asked whether any of their

38

Instead, in reaching the decision to excuse Juror No. 7, the judge relied on the hearsay statements of two jurors. The judge asked the foreperson, whether he agreed with the allegations in Juror No. 12's note. While the judge's questioning of the foreperson may have bolstered Juror No. 12's credibility, it did not resolve whether Juror No. 7 had actually lied or purposefully withheld material information during voir dire. Given that the judge did not witness Juror No. 7 making these statements, it was incumbent upon her to inquire further to develop an objective basis for understanding what had transpired in the jury room, for assessing the credibility of Juror No. 7 as well as the complaining jurors, and for determining whether Juror No. 7's statements revealed

close friends or family members had witnessed or been the victims of a violent crime. Although the prosecutor told the jurors that she planned to ask such a question, she never actually posed it. And, although the prosecutor did ask, generally, whether the jurors or any of their family members or close friends had been arrested or charged with a crime, the question may have confused the jurors given that the prosecutor gave a lengthy preamble to the question in which she talked about a juror's life experiences, including whether they had experienced crime or were familiar with the location of the crimes or knew the people involved in the case. Indeed, Juror No. 12 informed the judge after jury selection that she had been confused about the prosecutor's question and had failed to disclose that her husband had been convicted of a crime.

dishonesty or a lack of candor that would have served as a legal basis for dismissing her. Given that this inquiry was not made, the trial court's basis for dismissing Juror No. 7 was unsound. See *Mills*, 308 Ga. at 559-562 (2) (The trial court's limited inquiry into a juror's possible incapacity fell short of providing a sound basis for her removal.); *State v. Baker*, 351 Ga. App. 725, 726-730 (1) (832 SE2d 873) (2019) (The trial court did not abuse its discretion in granting defendant's motion for a new trial based on its determination that it erred in failing to question a juror about her alleged sleeping and alleged failure to deliberate before dismissing her.); *Dunn v. State*, 308 Ga. App. 103, 106 (1) (a) (706 SE2d 596) (2011) ("[I]n the absence of any questioning of the juror on the record, the judge's assertion that the juror 'may have missed crucial parts of the evidence' due to sleeping the previous day lacks any evidentiary support and, thus, appears to be mere speculation on his part."); *Semega v. State*, 302 Ga. App. 879, 879-882 (1) (691 SE2d 923) (2010) (Given that the jury was deadlocked, the trial court should not have relied solely on the foreperson's assertion that a juror was refusing to participate, but

should have conducted further inquiry before replacing the juror with an alternate.).

Because the judge's limited inquiry into Juror No. 7's alleged incapacity and misconduct fell short of providing a sound basis for the juror's removal, we conclude that the judge abused her discretion in removing Juror No. 7. Because such an error is prejudicial, Moon's convictions must be reversed. See *Mills*, 308 Ga. at 562-563 (2) ("Dismissal of a juror without any factual support or for a legally irrelevant reason is prejudicial." (citation and punctuation omitted)).

3. Moon raises several other enumerations of error. We will address the claims that appear likely to recur if the State chooses to retry this case. Moon contends that the trial court erred in admitting pursuant to OCGA § 24-4-404 (b) ("Rule 404 (b)") evidence relating to a 2005 incident that resulted in his convictions for three counts of aggravated assault. He argues that the evidence was not admissible under Rule 404 (b) for the purpose of proving intent, motive, or identity. He also argues that the evidence should have been

excluded under OCGA § 24-4-403 ("Rule 403") because it presented a danger of unfair prejudice that substantially outweighed its probative value. Finally, he argues that the trial court should have excluded highly inflammatory photographic evidence of the prior crimes.

(a) *Rule 404 (b).* Under Rule 404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith[,]" but such other-acts evidence may be admissible for other purposes, including to prove intent, motive, and identity. The party offering evidence under Rule 404 (b) must show three things:

> (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

(Citation omitted.) *Strong v. State*, 309 Ga. 295, 300 (2) (a) (845 SE2d 653) (2020). As to the first required showing, "relevant evidence" is defined as that evidence which has "any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. "This is a binary question — evidence is either relevant or it is not." *Strong*, 309 Ga. at 301 (2) (a). Rule 403, which governs the second required showing, provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403 "is designed to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (Citation and punctuation omitted.) *Strong,* 309 Ga. at 301 (2) (a). "The third part of the test is a preliminary question of fact for the trial court. Other-acts evidence may be admitted if the court concludes that the evidence is sufficient for the jury to find by a preponderance of the evidence that the other act was committed." (Citation and punctuation omitted.) Id. "We review the trial court's ruling admitting evidence under Rule 404 (b) for

abuse of discretion." Id.

(b) *The trial court's admission of the other-acts evidence under Rule 404 (b).* At a pretrial hearing, the State asked the trial court to admit under Rule 404 (b) evidence that on July 10, 2005, Moon assaulted three people by shooting them repeatedly with an AK-47 rifle. Moon, who was indicted for these crimes along with co-defendant Jabril Whitehead, pleaded guilty to three counts of aggravated assault on November 26, 2007.[9] The State argued that evidence of the prior aggravated assaults was relevant and admissible for the purposes of proving, among other things, Moon's intent, motive, and identity. Over Moon's objection, the trial court, after hearing the State's proffer of the expected evidence and the arguments of counsel, entered an order allowing the evidence to be admitted pursuant to Rule 404 (b) "for the purposes of proving intent, motive, and identity."

At trial, the State presented the testimony of two of the three

---

[9] Although the record does not contain a copy of Whitehead's conviction, it appears from the transcript of Moon's guilty plea that Whitehead also pleaded guilty to these crimes.

shooting victims and the detective who investigated the shooting. Through these witnesses, the State established that, during the afternoon of July 10, 2005, Moon and Whitehead followed the victims in a rental car and waited until they parked in a Chatham County neighborhood. As Whitehead stopped the car near the victims, Moon got out of the passenger side and used an AK-47 rifle to repeatedly shoot Jerrell Williams and two other men as they sat in the parked car. The victims of the shooting survived. They identified Moon as the shooter and Whitehead as the man who drove Moon to and from the scene of the shooting. The car used in the shooting had been rented by Whitehead's aunt. According to the detective and one witness, Moon shot at Williams and the others in the car because Moon believed that Williams had accused him of stealing some pit bull puppies. In addition to this testimony, the State tendered photographic evidence of the 2005 crimes. The 33 photographs admitted depicted pictures of the crime scene, the damage to the car, the numerous shell casings surrounding the car, and the victims' wounds. The State also tendered the certified copy

of Moon's convictions. Prior to the admission of the Rule 404 (b) evidence (and again in the final charge), the trial court instructed the jury that the evidence was being offered for the limited purposes of proving identity, motive, and intent, and that the jury was not authorized to infer from the evidence that the defendant is of a character that would commit such crimes.

(c) *The 2005 crimes were relevant under Rule 404 (b) for the purpose of proving intent, but not motive or identity.* Moon does not contend that his prior conviction should have been excluded on the ground that the State's pretrial proffer was insufficient for the trial court to conclude that a reasonable jury could find by a preponderance of the evidence that Moon had committed the acts of aggravated assault. Therefore, we consider whether the evidence was relevant under Rule 404 (b) and, if so, whether it should have been excluded under Rule 403.

(i) *Intent.* "[T]he relevance of other[-]acts evidence offered to show intent is established when the [other] act was committed with the same state of mind as [a] charged crime." *Naples v. State*, 308

Ga. 43, 51 (2) (e) (838 SE2d 780) (2020). See also *Olds v. State*, 299 Ga. 65, 72 (1) (786 SE2d 633) (2016) ("[E]vidence that an accused committed an intentional act generally is relevant to show . . . that the same defendant committed a similar act with the same sort of intent." (citation omitted)). In this case, Moon was charged with several crimes, including aggravated assault and felony murder predicated on aggravated assault by shooting Biancosino and Pickels with an SKS or AK-47 rifle. To prove that Moon was a party to the aggravated assaults, the State had to prove that Moon shared in Grant's intent either to violently injure Biancosino and Pickels (whom he mistook for Allen) or to commit an act that placed the victims in reasonable apprehension of immediately receiving a violent injury.[10] The State also had to show that Moon intentionally aided or abetted the commission of Grant's crimes; or that he intentionally advised, encouraged, or counseled Grant to commit the

---

[10] See OCGA §§ 16-5-20 (a); 16-5-21 (a) (2). See also *Jackson v. State*, 306 Ga. 69, 78 (2) (b) (ii) (829 SE2d 142) (2019) ("[A]ssault with the aggravating factor of use of a deadly weapon is a general intent crime." (citation, punctuation and footnote omitted)).

47

crimes. See OCGA § 16-2-20 (b) (3), (4); see also *Downey v. State*, 298 Ga. 568, 569 (1) (783 SE2d 622) (2016) ("[A] conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the principal perpetrator of the crime." (citation and punctuation omitted)). The evidence of Moon's 2005 aggravated assaults showed that he had the intent to violently injure Williams and the other passengers in the car by firing an AK-47 rifle repeatedly at them. Moon pleaded guilty to those offenses, and witnesses testified to his actions. Because Moon pleaded not guilty to the charged felony murder and aggravated assault offenses, the evidence of his prior aggravated assault convictions was relevant to the issue of his intent and, thus, satisfied the relevancy requirement of Rule 404 (b). See *Strong*, 309 Ga. at 309-310 (2) (d) (1); *Olds*, 299 Ga. at 72 (1).

(ii) *Motive.* To properly show motive, "the extrinsic evidence must be logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged." (Citation and punctuation omitted.) *Strong*, 309 Ga. at 312 (2) (d)

(2). The State argued that the evidence of Moon's other violent acts was relevant to show that he "believed it acceptable to engage in gun violence to solve disputes." This "is a classic improper propensity argument, focusing on [Moon's] violent . . . character and identifying his motive to act in far too generic a fashion." (Citation and punctuation omitted.) Id. The use of Moon's involvement in the 2005 shootings as motive evidence is especially problematic because the person alleged to have had the motive to kill Allen, the intended victim, was not Moon but Grant. Accordingly, the trial court abused its discretion by admitting the other-acts evidence to show Moon's motive. See id.

(iii) *Identity*. When evidence is offered pursuant to Rule 404 (b) to prove identity, it must

> satisfy a particularly stringent analysis. When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused. In other words, the evidence must demonstrate a modus operandi. The extrinsic act must be a "signature" crime, and the defendant must have used a modus operandi that is uniquely his. The signature trait requirement is imposed

49

to ensure that the government is not relying on an inference based on mere character – that a defendant has a propensity for criminal behavior. Evidence cannot be used to prove identity simply because the defendant has at other times committed the same commonplace variety of criminal act.

(Citations and punctuation omitted.) *Brooks v. State*, 298 Ga. 722, 725 (2) (783 SE2d 895) (2016). See also *McKinney v. State*, 307 Ga. 129, 136 (3) (b) (834 SE2d 741) (2019) (same). Additionally, a trial court must "consider the dissimilarities as well as similarities in determining whether other acts evidence is admissible to show identity." *Brooks*, 298 Ga. at 725-726 (2).

Although the 2005 aggravated assaults and the charged crimes have many similarities, the investigating detective testified that the use of rental cars and high-powered rifles in shootings to settle personal vendettas was not uncommon in Chatham County. The crimes also had some notable dissimilarities. The 2005 assaults happened during the day, while the charged crimes happened at night; unlike the 2005 assaults, the charged offenses occurred with some stealth (the shooter wore a mask and crept up on the victims);

and, most significantly, unlike the 2005 offenses, Moon was not the shooter in the charged offenses and Grant was not involved in the 2005 incident. Given that this type of crime was not unique to Moon and because the two crimes, though similar, were not sufficiently uncommon so as to constitute a signature crime, the prior crimes were not admissible under Rule 404 (b) to prove identity. See *Brooks*, 298 Ga. at 725 (2) (Because "the modus operandi for each murder was relatively commonplace — [they] were not signature crimes."); *Amey v. State*, 331 Ga. App. 244, 250 (1) (a) (770 SE2d 321) (2015) (prior armed robbery of a woman alone at night after she parked her car not in the nature of a signature crime so as to be proof of the perpetrator's identity). Accordingly, the trial court also abused its discretion by admitting the other-acts evidence to show Moon's identity.

(d) *The 2005 crimes were admissible under Rule 403 to prove intent.* Although the 2005 aggravated assault evidence was relevant to show intent, in determining whether the evidence nevertheless should have been excluded under Rule 403, the trial court was

51

required to consider factors including the overall similarity of the other acts to the charged crimes, the temporal remoteness of the other acts, and the prosecutorial need for the other-acts evidence. See *Jackson v. State*, 306 Ga. 69, 77 (2) (b) (ii) (829 SE2d 142) (2019). See also *Kirby v. State*, 304 Ga. 472, 481 (4) (a) (819 SE2d 468) (2018) (When other-act evidence is presented to show intent, Rule 403 requires a case-by-case, "common sense assessment of all the circumstances surrounding the extrinsic act and the charged offense." (citation and punctuation omitted)). Applying this analysis, the record shows that the trial court did not abuse its discretion in admitting the 2005 aggravated assaults because they had significant probative value in demonstrating that Moon shared Grant's criminal intent to seriously injure or kill his intended victim.

Although the probative value of the prior aggravated assaults was diminished somewhat because they occurred seven years before the charged crimes, they were not so remote as to be lacking in evidentiary value. The record shows that Moon was sentenced to serve two years of a ten-year sentence, the balance probated, after

pleading guilty in 2007, and that he was on probation when the charged crimes were committed in 2012.[11] See *Kirby*, 304 Ga. at 484 (4) (a) (i) (Explaining that, despite an 11-year gap between the prior and charged acts, the prior act was not so remote "as to be lacking in evidentiary value," at least where the appellant was incarcerated for much of the intervening period. (citation and punctuation omitted)).

The prior crimes were also similar to the charged crimes in significant respects. See *Kirby*, 304 Ga. at 484 (4) (a) (i) (Explaining that, when other-acts evidence is introduced to prove intent as opposed to identity, "a lesser degree of similarity between the charged crime and the (extrinsic evidence) is required." (citation and punctuation omitted)). Both shootings took place in Chatham County in predominantly residential neighborhoods. Both shootings

---

[11] It is not clear from the record exactly how long Moon was incarcerated between the 2005 and 2012 shootings. The record shows that, after Moon was arrested for the 2005 shootings, he remained in jail. When he was sentenced in 2007, he was given credit for time served and released from prison shortly thereafter. Moon was subsequently arrested for committing new offenses, and his probation was twice revoked, in 2008 and 2009. In 2009, the court revoked two years of Moon's sentence.

were precipitated by perceived slights or insults. In the prior crimes, Moon was offended that Williams had accused him of stealing puppies. In the charged crimes, Moon's best friend, Grant, was offended that Allen had failed to avenge the murder of Grant's brother. In both the 2005 crimes and the charged crimes, Moon and an accomplice followed the victims in a rental car and waited until they parked. Then, either Moon or his accomplice fired multiple rounds from an AK-47 or similar rifle at victims who were sitting in a parked car. Although Moon was the shooter in the 2005 crimes and the driver in the charged crimes, the evidence in both cases was sufficient to show that, in both crimes, driver and shooter shared a common criminal intent and were culpable as parties to the crimes. See id. (Although the prior acts were insufficiently similar to prove identity, the trial court had discretion to consider the similarities and differences between the prior crimes and to conclude that the evidence of the prior acts retained substantial probative value.)

Finally, the prosecutorial need for the evidence was significant. Except for the statement of the jailhouse informant, Green, the

evidence against Moon was entirely circumstantial. No eyewitnesses placed Moon in the car at the time of the shooting, and video surveillance of the shooting showed only a masked shooter getting into the passenger side of the getaway car. Moon maintained during his police interview that he had never been in the car. Although fingerprint evidence and witness testimony placed Moon in the car with Grant on the night of the shooting, the evidence showed that only Grant had a motive to kill Allen. Consequently, evidence that Moon shared Grant's criminal intent was crucial to proving Moon's guilt. To satisfy its burden of proof and to establish that Moon shared in Grant's intent to shoot the victims, the State needed evidence from which the jury could infer that intent. See *Harrison v. State*, 310 Ga. 862, 868 (3) (855 SE2d 546) (2021); *Thompson v. State*, 308 Ga. 854, 858-859 (2) (843 SE2d 794) (2020).

Given the significant probative value of the evidence in proving Moon's shared criminal intent, the trial court did not abuse its discretion in admitting evidence of the 2005 incident on the issue of intent. See *McKinney*, 307 Ga. at 138 (3) (no abuse of discretion in

trial court's conclusion that prejudice did not substantially outweigh the significant probative value of appellant's prior assault). Upon retrial of this case, however, the trial court should reconsider the extent to which the State should be allowed to present photographic evidence of the 2005 crimes. Rule 404 (b) applies with equal force to the admission of the photographs from the 2005 incident as it does to testimony because each photograph constitutes "extrinsic evidence of a prior crime." *United States v. Bush*, 673 Fed. Appx. 947, 951 (11th Cir. 2016). Consequently, if photographic evidence of the prior crimes is not relevant to proving Moon's intent under Rule 404 (b), or if it is relevant but does not meet the criteria for admission under Rule 403, including being needlessly cumulative, it should be excluded. See id.

4. Moon contends that the trial court should have suppressed the evidence seized from his residence pursuant to a search warrant, including two rifles found in a locked shed on the property because

the warrant was not supported by probable cause.[12]

Moon contends that the search warrant was issued without probable cause, arguing that the information in the supporting affidavit was based on statements from an unreliable witness, lacked sufficient indicia of reliability, and failed to show a basis for believing that evidence of a crime would be found at Moon's residence. We disagree.

In reviewing whether a search warrant was supported by probable cause, as required by the Fourth Amendment, see *Illinois v. Gates*, 462 U. S. 213, 239 (III) (103 SCt 2317, 76 LE2d 527) (1983), we bear in mind that

> the magistrate's task is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a

---

[12] In this enumeration of error, Moon also baldly asserts that the search warrant constituted a "general warrant," but his brief offers no legal argument or citation of authority in support of this claim. Thus, this claim of error is deemed abandoned. See Supreme Court Rule 22 ("Any enumerated error not supported by argument or citation of authority in the brief shall be deemed abandoned. . . ."). See also *Williams v. State*, 306 Ga. 365, 366 (828 SE2d 360) (2019) (claim of error abandoned when appellant offered no arguments in support of claim).

particular place. The test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life. The trial court may then examine the issue as a first level of review, guided by the Fourth Amendment's strong preference for searches conducted pursuant to a warrant, and the principle that substantial deference must be accorded a magistrate's decision to issue a search warrant based on a finding of probable cause. And when an appellate court reviews a search warrant, it uses the *Gates* totality-of-the-circumstances analysis to determine if the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant. The Fourth Amendment requires no more. In reviewing the trial court's grant or denial of a motion to suppress, we apply the well-established principles that the trial court's findings as to disputed facts will be upheld unless clearly erroneous and the trial court's application of the law to undisputed facts is subject to de novo review, keeping in mind that a magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court.

(Citations and punctuation omitted.) *Palmer v. State*, 310 Ga. 668, 671-672 (2) (a) (853 SE2d 650) (2021).

The lead detective's affidavit in support of the application for the search warrant set forth the details about the homicides, including the type of ammunition used to kill Biancosino and Pickels. The lead detective described how video recordings of the car

58

used in the shooting led investigators to Kiawana Williams. In the affidavit, the detective recounted Williams's many false statements, but explained that she began cooperating after she was confronted with evidence proving that she had lied. Williams reluctantly identified Moon from a photograph and said that she had loaned her car to Moon and Grant on the night of the shooting. She explained that she had lied before because Moon had told her to and because "she was scared about what [he] might do to her." The detective also reported that Williams had purchased cell phones for Moon and Grant, and she provided the detective with those phone numbers. After obtaining records for those phone numbers, the detectives learned that one of the phones had been used in close proximity to the scene of the crime around the time of the shooting. Also, Moon's fingerprints had been found on the hood of Williams's rental car. Moon was arrested by his probation officer on September 7, 2012, at the residence for which the detective was seeking a search warrant. At the time of the arrest, the probation officer saw three cell phones in Moon's bedroom. Moon's parole officer confirmed that Moon had

signed a Fourth Amendment waiver as a condition of his parole. Moon had prior felony convictions involving the possession and use of firearms.

In its order denying Moon's motion to suppress, the trial court upheld the magistrate judge's finding of probable cause, stating:

> Here, police had information that [Moon], named and identified by Williams, had been driving a vehicle matching the description of the vehicle used by the murder suspects around the time of the homicides and was alleged to be in possession of cell phones that were used in the area of the homicides a short time thereafter. The information that [Moon] had used the car was corroborated by [his] fingerprint on the car.

Moon does not contend that any of the assertions in the affidavit are untrue, only that they lack significance and, therefore, do not provide support for a search warrant. For example, he argues that Williams was unreliable, Moon's fingerprint on the exterior of the car proves nothing, and the information concerning the cell phones is "of no consequence because cell phones have become ubiquitous in our society." Such arguments, however, "ignore our deferential standard of review and the requirement that we consider

the totality of the circumstances in determining whether the magistrate, as a practical, common-sense matter, had a substantial basis for concluding that probable cause existed to issue the search warrant." *Palmer*, 310 Ga. at 673 (2) (a). Under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant; therefore, the trial court did not err in denying Moon's motion to suppress on this ground.

5. Moon contends that the trial court erred in denying his motion to sever Count 18, which charged him with attempting to purchase an AK-47 rifle five days after the double murder. We disagree.

> Where offenses are joined in a single indictment, a defendant has a right to severance where the offenses are joined solely on the ground that they are of the same or similar character because of the great risk of prejudice from a joint disposition of unrelated charges. However, where the joinder is based upon the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, severance lies within the sound discretion of the trial judge since the facts in each case are likely to be unique. If severance is not mandatory, it is nevertheless incumbent upon the trial court to determine

whether severance was necessary to achieve a fair determination of [the defendant's] guilt or innocence as to each offense. To make that determination, the court should consider whether in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

(Citations and punctuation omitted.) *Carson v. State*, 308 Ga. 761, 764-765 (2) (a) (843 SE2d 421) (2020).

In the order denying Moon's motion to sever Count 18, the trial court concluded that the murder counts and Count 18 were properly joined. The court determined that the counts were based on a series of connected acts, reasoning that, because the murder weapon, identified by forensic evidence as either an SKS- or AK-47-type rifle, was never found and was presumably disposed of by Moon, Moon's alleged attempt to obtain an AK-47 shortly after the homicides — perhaps to replace the one that he disposed of — may be relevant to show his involvement in the homicides.[13] The trial court found that severance was not mandatory and exercised its discretion not to

---

[13] As noted above, the State presented evidence at trial that Moon and Grant disposed of the murder weapon.

sever Count 18 from the murder counts.

The trial court reasonably found that the murder counts and Count 18 were based on a series of connected acts and occurred closely in time with each other. We cannot say that, in view of the number of offenses charged and the complexity of the evidence to be offered, a jury would be unable to distinguish the evidence and apply the law intelligently as to each offense. Accordingly, the trial court did not abuse its discretion in denying Moon's motion to sever Count 18. See *Keller v. State*, 308 Ga. 492, 504-505 (7) (842 SE2d 22) (2020); *Doleman v. State*, 304 Ga. 740, 745 (3) (822 SE2d 223) (2018).

6. In addition to the claims of error addressed in this opinion, Moon also enumerates other claims of trial court error, prosecutorial misconduct, and ineffective assistance by his trial counsel. Because the remaining alleged errors involve issues that are not likely to recur at retrial, we need not address them. See *Williams v. State*, 299 Ga. 834, 840 (2) (792 SE2d 336) (2016).

*Judgment reversed and case remanded. All the Justices concur.*

Decided June 21, 2021.

Murder. Chatham Superior Court. Before Judge Freesemann.

*Kirby Clements, Jr.*, for appellant.

*Meg E. Heap, District Attorney, Bradley R. Thompson, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.