**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**November 10, 2022**

# In the Court of Appeals of Georgia

A22A1297. WILLIAMS v. THE STATE.

BROWN, Judge.

Following a jury trial, Antoine Williams was convicted of kidnapping, sexual battery, and three counts of simple battery. He appeals his convictions and the denial of his motion for new trial, as amended, contending that the trial court erred in admitting other act evidence and that the State failed to prove venue for the offenses of sexual and simple battery. We affirm.

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence." (Citation and punctuation omitted.) *Allen v. State*, 361 Ga. App. 300, 301 (864 SE2d 149) (2021). "We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether, after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation and punctuation omitted.) *Kimble v. State*, 356 Ga. App. 507 (847 SE2d 865) (2020).

So viewed, the record shows that the victim, who was 23 years old at the time of trial, was working as a server at Top Golf on the night of February 25, 2018, when she met Williams, a customer. While serving Williams' bay at Top Golf, the two conversed, and Williams told her he worked for Mercedes Benz and offered her a position as a personal assistant and babysitter for his children. When Williams told the victim the position would include health insurance, the victim agreed to give Williams her contact information. Williams offered the victim an iPhone as a tip which she refused.

After her shift, the victim went to a bar to meet her coworkers. While her coworkers failed to show, Williams met the victim at the bar. The victim and Williams spoke for one to two hours about the victim's goals, and Williams produced a folder of documents related to his different businesses, which the victim thought "looked very professional, laminated." Williams and the victim parted ways that night.

On the following day, the victim went to work at her second job at a barbecue restaurant. The victim expected Williams to stop by at some point with his coworkers to eat but was surprised to see Williams appear at the restaurant, alone, ten minutes before the restaurant opened at 11:00 a.m. Williams ordered to-go food and told the victim he would return with coworkers later. That afternoon, Williams came back to the restaurant with a Mercedes Benz car and a car salesman, telling the victim that he wanted to gift her the car. The victim declined and told him she could not leave her tables or she would be fired. In total, Williams showed up five different times at the victim's work that day, which "freak[ed] out [her] managers." On the last occasion, Williams left her an $80 tip.

The victim got off work at around 9:00 p.m., at which point her manager warned her that Williams was waiting outside. Other coworkers walked the victim to her car; she declined to hang out with Williams or get into his car. On the way home, the victim stopped to put gas in her car, and Williams appeared in his car, again asking her to hang out with him. The two went "back and forth" until she relented and agreed to hang out in a public place, suggesting a nearby Waffle House. The victim then followed Williams in the direction of Waffle House, but Williams passed it and pulled over at an ATM to withdraw money. The victim again followed Williams back

3

toward Waffle House, but Williams passed it a second time. At this point, the victim decided to go home.

Williams seemingly followed the victim for some amount of time before speeding up behind her, turning on his brights, and nearly rear-ending her car. The victim tried to change lanes, but Williams continued and began honking his horn and nearly hitting her again. The victim turned into the nearest business, a storage facility. Williams followed, rolled down his window, and again asked the victim why she would not hang out with him or just get in his car. The victim declined and said she would only hang out with him in public at Waffle House. Williams responded, "you have ten seconds [to get in the car] before you lose everything," and the victim saw Williams reach down for something. Fearing that Williams had a gun, the victim agreed to sit in Williams' car. The victim left all of her belongings in her car and left the driver door open, planning to get back into her car. The victim "sat halfway out [of Williams' car] so that way, if anything happened, [she] could attempt to run," but Williams yanked her in, slammed the door, locked the doors, and then said he had to whisper something to her. Williams then put his hands around the victim's face and pressed his face against hers. The victim testified that Williams whispered the following:

[H]e said that I belonged to him and that I will never get away from him for the rest of my existence. If I ever tell anybody and I get away, he will get out and he will find me. I'm his property. We'll get married whether I like it or not. And if I eat too much, then he will get tired of me but he will still own me and he will have me whenever he wants and whatever woman he gets to replace me.

Williams then instructed the victim to "[f]ix your face" before he started driving.

Williams drove around, stopping at different houses and gas stations, instructing the victim to stay in the car. At one point the victim tried to open her door but was unable because Williams had enabled "child lock." Williams had a basket of "name-brand clothes, different shoe sizes for [the victim] to try on. He wanted [her] to wear different clothes for [her] new life." The victim refused to change clothes. During the drive, Williams would touch the victim's thigh, and the victim "squeezed [her legs] shut so he wouldn't go deeper." He kissed the victim's hand and up her arm and forced her to hold his hand. If the victim did not hold his hand "correctly," Williams would slap her hand and/or yell at her. Williams discussed having sex with the victim, telling her she would enjoy it whether she agreed to it or not.

Eventually, Williams stopped at a QuikTrip gas station in Cartersville where a police officer was inside talking to the clerk. Williams warned the victim that if she

went "anywhere near that pig, that's your head." The victim watched Williams go inside the store and chat with the police officer before returning to the car. When Williams unlocked the doors to get back into the car, the victim opened her door and yelled "I ha[ve] to pee," making sure people heard her. Williams threatened to kill the victim if she did not get back in the car, and the victim ran into the store. The victim stayed outside of the bathroom, fearing that if she went into the bathroom Williams would follow her in there.

The police officer in the store, a Georgia State Patrol officer, noticed the scene but thought it was a domestic dispute. The officer observed that the victim was crying, had on only one shoe, and was in distress. After the victim told the officer that she had been taken and that she needed help, he realized it was something more than a domestic dispute and called dispatch to send local police. When the officer went outside, Williams had left but soon returned, and the officer was able to get his license plate number. According to the officer, Williams left and returned to the gas station multiple times. On one occasion, Williams came inside and stated that the victim needed to go to the hospital. The officer sensed that Williams was trying to get the victim back into the car with him. The victim asked to be taken to a police station because she was afraid Williams would find her again.

Williams was charged with kidnapping, sexual battery, and three counts of simple battery. The jury returned a verdict of guilty on all charges, and Williams subsequently filed a motion for new trial. Following a hearing, the trial court denied the motion, as amended, and this appeal followed.

1. Williams contends that the trial court erred in admitting evidence of a 2011 incident under OCGA § 24-4-404 (b). Because we find that the evidence was admissible under OCGA § 24-4-413, we need not address its admissibility under OCGA § 24-4-404 (b).

*The Other Act Evidence*

Ten days prior to trial, the State gave pretrial notice that it intended to introduce evidence of a 2011 incident pursuant to OCGA § 24-4-404 (b), "to illustrate intent, plan, motive, absence of mistake or accident, and for any other permissible purpose." A hearing was held one week before trial, during which the State proffered the expected testimony of the 2011 victim and argued that the evidence was relevant for the purposes of intent, motive, and plan. When questioned by the trial court, the State explained why it was not seeking to have the evidence admitted pursuant to OCGA § 24-4-413:

7

Your Honor, in this case . . . the only allegation of sexual conduct is the sexual battery. [Williams] is not charged with rape or anything like that. Yes, [the victim in the 2011 incident] was raped, and that's part of the incident that occurred with her. It's not the rape part so much the State is trying to get into. It's the events and the transactions leading up to it showing the defendant's behavior. So that's why we're arguing it under 404 (b).

The trial court orally ruled that it would admit the evidence and instructed the State to draft an "order that it outweighs any prejudice of character" and "[l]inking the 403 and 404 issues." The trial court subsequently issued a written order, drafted by the State, finding evidence of the 2011 incident relevant and admissible to illustrate intent, plan, and motive, and that "the probative value of [the evidence] is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, undue delay, waste of time, or needless presentation of cumulative evidence."

During Williams' trial, the victim in the 2011 incident testified that she and her mother had a talent agency in Texas and knew Williams as a photographer. In June 2011, the victim was living in Los Angeles when her mother contacted her about a possible business opportunity with Titleist and setting up a dinner meeting with the Titleist client. The meeting also would include Williams.

On the day of the meeting, Williams picked up the victim from her apartment, and they stopped at a store because the victim wanted to purchase a more professional shirt. Williams offered to buy the victim's shirt and the victim accepted. The two then proceeded to a hotel where Williams had booked a private outdoor villa for a dinner meeting with the client. While the two waited on the client to arrive, the victim ordered a glass of wine. Williams then informed her that the client had cancelled. The victim testified that about 30 minutes later, "everything [went] really fuzzy," and she did not remember anything. She came to in a dark hotel room, naked, with Williams on top of her having sex with her. The victim was fuzzy as to events that followed but remembered leaving in a panic and asking the hotel shuttle to take her home, Williams then showing up at her apartment and begging to sleep on her couch, barricading herself in her room with furniture while Williams slept on the couch, and waking up the next day to find Williams gone. She did not report the incident to police because she was "embarrassed, . . . confused, and . . . blamed herself." Believing she was drugged, the victim tried to get tested for drugs in her system but was told it was too late for detection.

Prior to this testimony, and during its charges to the jury, the trial court gave a limiting instruction, instructing the jury that it was permitted to consider the evidence only insofar as it related to intent, motive, and plan.

*Admissibility under OCGA § 24-4-413*

OCGA § 24-4-413 ("Rule 413") pertinently provides that "[i]n a criminal proceeding in which the accused is accused of an offense of sexual assault, evidence of the accused's commission of another offense of sexual assault shall be admissible and may be considered for its bearing on any matter to which it is relevant." OCGA § 24-4-413 (a). Further, Rule 413 "supersede[s] the provisions of OCGA § 24-4-404 (b) in sexual assault . . . cases." *Dixon v. State*, 341 Ga. App. 255, 258 (1) (800 SE2d 11) (2017). In analyzing the admissibility of evidence under Rule 413, "[a] court must first determine that the defendant is accused of an offense of sexual assault. Second, the court must find that the evidence proffered is evidence of the defendant's commission of another offense of sexual assault." (Citations and punctuation omitted.) *United States v. Guardia*, 135 F3d 1326, 1328 (I) (10th Cir. 1998) (discussing the threshold requirements of Federal Rule of Evidence 413).[1] The statute

---

[1] As discussed infra, Rule 413 is based on Federal Rule of Evidence 413. "[W]here the new Georgia rules [of evidence] mirror their federal counterparts, it is clear that the General Assembly intended for Georgia courts to look to the federal

10

defines sexual assault to include the crimes of rape and sexual battery. OCGA § 24-4-413 (d). Therefore, evidence of the 2011 incident was governed by Rule 413 (a). See OCGA § 16-6-1 (a) (1) ("A person commits the offense of rape when he has carnal knowledge of . . . [a] female forcibly and against her will[.]").

(a) *Pretrial Notice.* Rule 413 contains a notice requirement providing as follows:

> In a proceeding in which the prosecution intends to offer evidence under this Code section, the prosecutor shall disclose such evidence to the accused, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, at least ten days in advance of trial, unless the time is shortened or lengthened or pretrial notice is excused by the judge upon good cause shown.

OCGA § 24-4- 413 (b). Rule 413 is based on Federal Rule of Evidence 413, including its pretrial notice requirement.[2] See Paul S. Milich, Ga. Rules of Evidence § 11:26 (2022).

---

rules and how federal appellate courts have interpreted those rules for guidance." *Pierce v. State*, 302 Ga. 389, 392 (1) (a) (807 SE2d 425) (2017).

[2] Federal Rule of Evidence 413 (b) provides: "If the prosecutor intends to offer this evidence, the prosecutor must disclose it to the defendant, including witnesses' statements or a summary of the expected testimony. The prosecutor must do so at least 15 days before trial or at a later time that the court allows for good cause." Thus, the federal rule requires fifteen days notice while the Georgia rule requires only ten.

In *United States v. Benais*, 460 F3d 1059 (8th Cir. 2006), the Eighth Circuit Court of Appeals held that subsection (b) of Federal Rule 413 "clearly requires disclosure of the evidence itself," rejecting the defendant's argument that the notice requirement "imposes on the Government a separate obligation to specifically disclose or declare the intention to rely upon Rule 413 for admissibility" because "[t]here is no such requirement in the Rule[.]" Id. at 1062 (II) (A). In that case, the defendant was charged with multiple counts of aggravated sexual abuse and the sexual abuse of a minor relating to the rape of a 14-year-old girl. Id. at 1060-1061 (I). In advance of trial, the government disclosed to the defendant all reports and witness statements that it possessed, including the witness statement of another 14-year-old girl reporting that the defendant had sexual intercourse with her on the same night. Id. at 1061 (I). The defendant moved to exclude this evidence based on the fifteen-day notice requirement in Federal Rule 413 (b), arguing that it was not sufficient for the government to disclose the witness' statement, but rather, the government was required to provide specific notice of its intent to offer the evidence under Rule 413. Id. The trial court admitted the evidence under Federal Rule 404 (b). Id. at 1062 (I). On appeal, the Eighth Circuit affirmed the admission of this evidence under Rule 413, declining to address its admission under Federal Rule 404 (b). Id. at 1062-1063 (II)

12

(A). It did so based on its authority to "affirm on any ground supported by the record." (Citation and punctuation omitted.) Id. at 1062 (II) (A).

Given that Georgia's Rule 413 is based on Federal Rule 413, and given that the State disclosed the evidence of the 2011 incident more than ten days in advance of trial, we conclude that Williams received the requisite notice under Rule 413 (b). See *Benais*, 460 F3d at 1062-1063 (II) (A). See also *United States v. Mandoka*, 869 F3d 448, 455 (I) (B) (2) (6th Cir. 2017). As stated above, we will address the admissibility of the evidence under Rule 413. See *Mathis v. State*, 279 Ga. 100, 102 (3) (a) (610 SE2d 62) (2005) (affirming trial court's admission of evidence under the right-for-any-reason rule); *Albright v. State*, 354 Ga. App. 538, 549 (4), n.8 (841 SE2d 171) (2020) (same).

(b) *Relevant Purpose.* Williams contends that evidence of the 2011 incident was not admitted for a proper purpose, but rather was introduced simply to demonstrate his "deviant character." But, Rule 413 "creates a rule of inclusion, with a strong presumption in favor of admissibility, and the [S]tate can seek to admit evidence under its provisions for any relevant purpose, including propensity." (Citation and punctuation omitted.) *Fossier v. State*, 362 Ga. App. 184-186 (2) (867 SE2d 545) (2021). See also *McAllister v. State*, 351 Ga. App. 76, 80-81 (1) (830 SE2d

13

443) (2019) ("[a]lthough lustful disposition is not one of the purposes specifically set out in OCGA § 24-4-404 (b) for the admission of other acts, OCGA § 24-4-413 provides an exception to the general rule in sexual assault cases and allows the admission of propensity evidence"). Evidence of Williams' prior offense of rape was relevant to prove his "lustful disposition" in the current case, and to disprove his claim that the victim had fabricated her version of events. See *Robinson v. State*, 342 Ga. App. 624, 633-635 (4) (a) (805 SE2d 103) (2017).

(c) *Balancing Test under OCGA § 24-4-403.* Evidence admitted under Rule 413 is still subject to the balancing test found in OCGA § 24-4-403 ("Rule 403"). *State v. McPherson*, 341 Ga. App. 871, 874 (800 SE2d 389) (2017). A trial court may exclude relevant evidence under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (Citation and punctuation omitted.) *Latta v. State*, 341 Ga. App. 696, 701 (2) (802 SE2d 264) (2017). "Rule 403 is an extraordinary remedy, and . . . in reviewing the admission of evidence under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." (Citation and punctuation omitted.) *Wilson*

14

*v. State*, 312 Ga. 174, 190 (2) (860 SE2d 485) (2021). In applying the Rule 403 balancing test, "the trial court must make a common sense assessment of all the circumstances that may logically bear on the probative or prejudicial value of the evidence, including the need for the evidence, the overall similarity between the prior offense[ ] . . . and the charged conduct, and the temporal remoteness of the prior offense[ ]." Id. at 190 (2).

As to similarity, the evidence shows that the 2011 incident was similar to the charged offense in the following ways. Both victims were females close in age. In both instances, Williams made contact with the victims under the auspices of business and a professional relationship. In one instance, Williams purchased clothing for the victim, and in the other, Williams attempted to give the victim a cell phone, car, and clothing. Finally, each involved nonconsensual sexual contact with the victim. "Although the probative value of the prior [act] was diminished somewhat because [it] occurred seven years before the charged crimes, [it was] not so remote as to be lacking in evidentiary value." *Moon v. State*, 312 Ga. 31, 55 (3) (d) (860 SE2d 519) (2021).

Turning to prosecutorial need, Williams' theory of defense at trial was the victim's lack of credibility and the unbelievability of her story; during both opening

15

and closing arguments, defense counsel asserted that the victim's version of events was fabricated, that the victim had voluntarily gotten into Williams' car, and that Williams was merely offering the victim a job without any sexual motive or intent.[3] "It is true, of course, that when the defendant seeks to attack a victim's credibility, the State has an increased need to introduce evidence of prior acts." *McAllister*, 351 Ga. App. at 84-85 (1) (c). Given that the case boiled down to Williams' word against the victim's, the prosecutorial need for the prior act evidence was high. Id.

On the other hand, the risk of unfair prejudice from the prior act evidence is relatively low. "Prejudice is not 'unfair' simply because it tends to inculpate the defendant in an awful crime but only if it creates an undue tendency to suggest decision on an improper basis such as an emotional one." (Citation and punctuation omitted.) *State v. Berrien*, 364 Ga. App. 217, 227 (2) (b) (874 SE2d 430) (2022). See *State v. Dowdell*, 335 Ga. App. 773, 780-781 (783 SE2d 138) (2016) (Peterson, J., concurring specially) (in the context of Rule 413, while propensity ordinarily constitutes unfair prejudice, the text of the rule allowing propensity evidence in specific contexts reflects a policy decision that the prejudice of propensity is not

---

[3] During the motion for new trial hearing, Williams' trial counsel testified that his "defense strategy was credibility."

unfair in those contexts). Maximizing the evidence's probative value and minimizing its undue prejudicial impact, as we must, we find no clear abuse of the trial court's discretion in determining that the evidence was more probative than prejudicial.

Williams also asserts that the trial court did not adequately conduct the balancing test in admitting the evidence. Specifically, Williams argues that the "record is absent on the legal analysis required by a trial court" based on its oral ruling during the hearing and its drafting instructions to the State. "[A]bsent some express showing that the trial court did not understand its obligation to conduct the balancing test, we will not read such error into the trial court's ruling." *Webb v. State*, 359 Ga. App. 453, 459-460 (2) (858 SE2d 546) (2021). Moreover, "there is no requirement that the court explicitly analyze the balancing test on the record." *Wilkerson v. State*, 356 Ga. App. 831, 833 (1) (849 SE2d 677) (2020). Here, the trial court, in admitting the evidence during the hearing, referenced the balancing test as well as Rule 403, and thus implicitly found that the evidence was admissible after applying Rule 403's balancing test. See *Entwisle v. State*, 340 Ga. App. 122, 131 (2) (796 SE2d 743) (2017) (where trial court did not make specific findings regarding whether the probative value of the prior crimes was outweighed by its prejudicial impact, but it explicitly referenced the balancing test and noted that "the evidence

17

must satisfy Rule 403," the trial court applied the balancing test and implicitly found that the evidence was admissible pursuant to this test).

In sum, we find no abuse of the trial court's discretion in admitting the evidence of the 2011 incident under the circumstances. See *King v. State*, 346 Ga. App. 362, 364 (1) (816 SE2d 390) (2018) ("a trial court's decision to admit other acts evidence will be overturned only [when] there is a clear abuse of discretion") (citations and punctuation omitted).

2. Williams also contends that the State failed to prove venue. He argues that because the "touching" occurred at some point during the drive, it is unclear whether it occurred in Cobb County or after the car crossed into Bartow County. We find no merit in this contention.

"[V]enue is a jurisdictional fact the State must prove beyond a reasonable doubt in every criminal case." (Citation and punctuation omitted.) *Velasco v. State*, 306 Ga. 888, 891 (2) (834 SE2d 21) (2019). Pursuant to OCGA § 17-2-2 (e),

> [i]f a crime is committed upon any railroad car, vehicle, watercraft, or aircraft traveling within this state and it cannot readily be determined in which county the crime was committed, the crime shall be considered as having been committed in any county in which the crime could have been committed through which the railroad car, vehicle, watercraft, or aircraft has traveled.

OCGA § 17-2-2 (e) ("Crime committed while in transit"). Thus, "venue for a crime involving a vehicle may lie in any county through which the vehicle traveled." (Citation and punctuation omitted.) *Jones v. State*, 329 Ga. App. 439, 445 (1) (b) (765 SE2d 639) (2014).

Here, the indictment charged Williams with sexual battery based on Williams' touching of the victim's inner thigh, simple battery based on Williams grabbing the victim's hair, simple battery based on his slapping of the victim's hand, and simple battery based on his kissing of the victim's hand. The victim testified that all of this occurred during the car ride. Given the evidence presented, the jury was authorized to conclude beyond a reasonable doubt that the sexual battery and simple batteries could have been committed either in Cobb County or Bartow County, rendering venue proper in Cobb County. See *Harris v. State*, 279 Ga. App. 570, 573 (2) (631 SE2d 772) (2006); *Short v. State*, 276 Ga. App. 340, 343 (1) (a) (623 SE2d 195) (2005).

*Judgment affirmed. Barnes, P. J., and Hodges, J., concur*.